No. 18,259.

JAMES DETI, ET AL. *v.* CITY OF DURANGO.

(316 P. [2d] 579)

Decided October 10, 1957.   Rehearing denied November 4, 1957.

Mr. Lewis M. Perkins, for plaintiffs in error.

Messrs. Emigh & Emigh, for defendant in error.

Mr. Bentley M. McMullin, Amicus Curiae.

*En Banc.*

Mr. Justice Holland delivered the opinion of the Court.

Plaintiffs in error, as plaintiffs, filed an action in the district court of La Plata county against the city of Durango, a municipal corporation, to have an ordinance of the city, adopted February 14, 1956, declared unconstitutional and void, and to further obtain an injunction prohibiting enforcement of the ordinance.

The matter was submitted to the trial court upon facts that were admitted in the pleading; defendant's answers to interrogatories; by written and verbal stipulations. No evidence was offered or received.

It is difficult to epitomize the pleadings and the ordinance due to the length of the ordinance, as well as the pleadings, but we will content ourselves by pertinent excerpts therefrom.

In December 1955, a non profit, Colorado corporation was formed under the name of "The Durango, Colorado, Community Building Association." The corporate certificate states that the purpose is to be an "instrumentality of the City of Durango," and to acquire land and erect thereon and equip a public community building. In February following, the city council of Durango adopted the ordinance here in question, which recites that it is enacted pursuant to the provisions of C.R.S. '53, 139-61-1.

A reading of this ordinance discloses that the general purpose is to provide for the construction of the community building by the building association with funds obtained by virtue of a bond issue, and also for the

leasing of the building by the city. The ordinance contains the terms of the proposed lease, the rental to be paid by the city was $27,000 for the first year and $27,500 for each year thereafter for thirty-one years. This rental money is to be derived from charges made for the use of the building after operating costs, the net revenues of the city water system, the proceeds of the city cigarette tax, and from its parking meters, all of which revenues are irrevocably pledged for the rental payments. Being apparently hesitant about the question of whether or not, after garnering in all of the different sources of revenue just mentioned, the city was fully battened down, it was then arranged that the city be further obligated to pay the rental, "if necessary, from the general funds of the City or the proceeds of taxes to be levied by the City," and further, "if necessary, the City shall withdraw and advance from its general fund such amounts as may be required to pay such annual rental." As a saving clause or provision, the city had the questionable privilege of terminating the agreement by paying whatever amount might be necessary to redeem all of the outstanding bonds.

Complying with the city's charter, 20% of the qualified electors petitioned for a referendum vote as to the adoption of the ordinance. An election was held on May 1, 1956, and the ordinance was approved by a vote of 1,387 for and 1,012 votes against. This election was a "free for all," because it was not limited to electors who had paid a property tax within the preceding year.

In October 1955, the county of La Plata, of which defendant in error is the county seat, agreed to lease the community building for an annual rental of $13,500 and for equal rights with the city in naming the directors of the building association, "which will own and manage the proposed building." The city's budget for 1956 included $13,500 payable from general taxation for the rent of the building, and in May 1956, the city paid $12,500 and in August 1956, paid an additional $2,500.

This was about equally divided between the city of Durango and the county of La Plata. Over one year has elapsed since the payment by the city and the county of $15,100 and no building is underway. The building association's certificate of incorporation discloses that the corporation is an "instrumentality" of the city. The city's income was the plum dangling before the eager eyes.

Reference is made to the agreement embodied in the ordinance as a leasehold agreement. It is mentioned that the city has a right to have and to hold the premises demised for a term of thirty-one years, and the city is obligated to pay rent during that period. It is abundantly clear that the underlying purpose is to promulgate a way by which funds can be raised for the construction of the building. When considered in the light of the so-called joint undertaking or enterprise between the city and the county, this so-called lease goes beyond a bona fide rental agreement. It is a bold attempt to use the finances and credit of the city to construct the building, while all the time the city remains liable to pay the rent for the full term of thirty-one years, and this liability obtains in the event the lease should be terminated. And to make doubly sure that the city and the taxpayers are thereby gratuitously advancing the interest of a private corporation, the city winds up with no interest in the premises, the title and ownership thereto going to the building association.

There is no showing in the record as to the nature of the structure or why it is "necessary" for any purpose whatsoever. The record is silent as to any showing of compliance with statutory provisions, C.R.S. '53, 139-76-2, concerning the letting of the work to the lowest bidder, and nothing whatever to support the budget appropriation before the obligation is incurred. The final highlight of this nefarious scheme is, that there is no mention in the ordinance as to the cost of construction, and should it be less than $500,000, the amount of the bond

issue, the bond issue is to be paid in full by the city assuming that obligation, and in the event the building cost is in excess of the amount of the bond issue, the city is obligated to meet the difference.

There is no finding that the building is necessary for governmental or proprietary purposes. *Reimer v. Town of Holyoke*, 93 Colo. 571, 27 P. (2d) 1032; *Heberer v. Chaffee County*, 88 Colo. 159, 293 Pac. 349.

The limitations concerning municipal indebtedness are clearly set out in Article XI, section 8 of the Constitution of the State of Colorado, which is as follows:

"No city or town shall contract any debt by loan in any form, except by means of an ordinance, which shall be irrepealable, until the indebtedness therein provided for shall have been fully paid or discharged, specifying the purposes to which the funds to be raised shall be applied, and providing for the levy of a tax, not exceeding twelve (12) mills on each dollar of valuation of taxable property within such city or town sufficient to pay the annual interest and extinguish the principal of such debt within fifteen, but not less than ten years from the creation thereof, and such tax when collected shall be applied only to the purposes in such ordinance specified until the indebtedness shall be paid or discharged. But no such debt shall be created unless the question of incurring the same shall at a regular election for councilmen, aldermen or officers of such city or town be submitted to a vote of such qualified electors thereof as shall in the year next preceding have paid a property tax therein, and a majority of those voting on the question by ballot deposited in a separate ballot-box, shall vote in favor of creating such debt; but the aggregate amount of debt so created, together with the debt existing at the time of such election, shall not at any time exceed three per cent of the valuation last aforesaid. Debts contracted for supplying water to such city or town are excepted from the operation of this section. The valuation in this section mentioned shall be in all

cases that of the assessment next preceding the last assessment before the adoption of such ordinance."

It has been demonstrated that the obligations of the city as created by the ordinance are debts within the sense of the constitution, and the obligations to which the city is pledged extend beyond the limit fixed by the constitution, and furthermore, the attempted ratification or approval by the voters is, and was, an empty gesture, because the electors were not confined to those who had paid a property tax within the preceding year.

It is tantamount to an admission on the part of the city that the proposed building is not to be used for any of its governmental or proprietary functions, because the ordinance provides as follows:

"To pay as additional rent all taxes, assessments or impositions by the State or Federal Government or any other governmental authority on said building and land, and, in addition, to pay as additional rent all taxes, assessments or impositions by the State or Federal Government or any other governmental authority levied on or against the Association."

It is clearly evident that those who promulgated the ordinance realized that it was not for governmental uses, because if so used, it would be free of taxation. It may further be said that if this was a public improvement paid for by revenue derived from taxes, then no heed was paid to the statute by providing for the contract to be let to the lowest responsible bidder on open bids after advertisement according to C.R.S. '53, 139-76-3.

Counsel for the city state: "In the present case the city is agreeing only to pay rent and does not guarantee any debts whatsoever of the Building Association." This is an amazing statement, because the agreement incorporated and adopted by the ordinance states: "This agreement is intended by the parties to secure the payment in full of said bonds. In the event of the failure, neglect or refusal of the Association to compel the per-

formance of the obligations of the City under this agreement, the holder of said bonds then outstanding shall be subrogated to the rights, privileges and remedies of the Association and such holder shall have the right to commence an action, suit or proceedings in any court of competent jurisdiction to compel the performance of the obligations of the City under this agreement." The theme running throughout the entire ordinance relates to "the obligations of the City under this agreement." A laborious study could not have conceived or devised a more complete obligation on the part of the city than is created by this ordinance.

There is no reason to discuss the claimed application of the "special fund" doctrine in this case, because it is so manifest that the city is irrevocably obligated to use, if necessary for the payment of the rental, the revenues from the water system, cigarette tax, parking meters, and if not then sufficient, to reach into the city's general funds.

It has been abundantly demonstrated herein that the ordinance is unconstitutional and void and therefore the judgment of the lower court is reversed.