Arthur J. GUDE, 3rd, Peter H. Fieber, Lowell J. Jarratt, and Chester I. Thompson, as residents, voters and taxpayers of the City of Lakewood, Colorado, for themselves and also as representatives on behalf of all other residents, voters and taxpayers of said City, Plaintiffs-Appellants,

v.

The CITY OF LAKEWOOD, Colorado; Charles Whitlock, individually and also as the Mayor of said City; the City Council of said City; Carolyn Bacher, Sharon Carr, James Eitzen, Raymond Fink, Jim Lee, John A. Morgan, Carl Neu, Jr., Gaylor V. Smith, Paul W. Thompson, and Lester Willson, individually and also as members of the City Council of said City; Robert O. Darrow, individually and also as the City Treasurer of said City; Charles S. Anderson, individually and also as the City Administrator of said City; Lakewood Public Building Authority, a Colorado non-profit corporation; and David L. Hoover, Kathleen Kleinkopf, John F. Milan, Franklin J. Parks, Jr., and Linda Shaw, individually and also as the members and officers of said corporation, Defendants-Appellees.

No. 80SA81.

Supreme Court of Colorado.

Nov. 2, 1981.

Rehearing Denied Nov. 16, 1981.

Elias J. Candell, Lakewood, for plaintiffs-appellants.

Gorsuch, Kirgis, Campbell, Walker & Grover, John S. Pfeiffer, Robert E. Warren, Jr., Lamm, Edstrom & Stowe, William O. Lamm, Denver, for defendants-appellees.

J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., Stephen H. Kaplan, First Asst. Atty. Gen., Denver, amicus curiae.

LOHR, Justice.

The plaintiffs, who are residents, voters, and taxpayers of the City of Lakewood (city), brought this suit in Jefferson County District Court[1] challenging the legality of actions by the city, the Lakewood Public Building Authority (building authority) and certain of their officials in structuring plans for the financing and construction of a municipal office building (city hall) and in committing to spend monies in furtherance of that project. The plaintiffs' principal claim is that the city hall financing proposal violates *Colo.Const.* Art. XI, § 6, which prohibits the city from incurring a general obligation debt unless approved by the voters. The plaintiffs also contest certain city expenditures unrelated to the municipal office building. Finally, they seek restitution and exemplary damages from those individual defendants who participated in the alleged wrongful actions. A trial to the court resulted in a judgment for the defendants on all claims. The plaintiffs appeal, and we affirm.

In 1974, at the request of Lakewood, a statutory city, a citizens committee was formed to provide advice on how best to meet the need for additional municipal office space. After study, the citizens committee recommended the construction of a new city hall. The city then caused a special bond election to be held on February 7, 1978, at which the question of issuing city's general obligation bonds to finance the proposed construction was submitted to the voters. The proposal was defeated by an 81%–19% margin, and the city sought other ways of financing a new municipal office building.

After further study and consultation with the citizens committee, the city determined that the most economic, efficient and beneficial method of financing and constructing a new municipal office building would be through an agreement with a non-profit public building corporation. At the city's request, certain members of the citizens committee then formed the building authority as a Colorado non-profit corporation for that purpose. The corporate bylaws provide that no member or director of the building authority can be an elected official or employee of the city. The city has no right to control any action of the building authority.

The financing and construction plan can be outlined briefly. The site was to be donated to the city by a third party, subject to a possibility of reverter designed to assure construction of a municipal office building as a condition to continued city ownership. The city would then lease that land to the building authority for a 25-year term for the construction of a city hall to be built in accordance with plans and specifications to be developed and approved by the city and within a city-established budget. The building authority would contract with a builder for construction of the city hall. Upon completion of construction, the building authority would lease the land and building back to the city for a 25-year period through a one-year lease with a series of one-year renewal options. Renewal would occur automatically at the conclusion of each year unless the city elected against it. In the event of nonrenewal, the city would not be obligated for future rentals.

To finance the construction, the building authority would first issue and sell its bond anticipation notes in the total principal amount of $6,100,000. Part of the proceeds would be used to pay preliminary costs of the project, including the architectural fees. Upon completion of the structure, the building authority would issue its 25-year-term revenue bonds in payment of the anticipation notes. The bonds would be redeemed by application of the lease rentals to be received from the city. The bond obligations would be secured by a lien on the city hall and on the 25-year lease from the city

---

1. In their amended complaint, the plaintiffs purport to sue for themselves and as representatives of all other residents, voters and property taxpayers of the City of Lakewood. No action was taken to obtain a judicial determination whether the case could be maintained as a class action. *See* C.R.C.P. 23(c)(1). No party complains of this deficiency on appeal, and we do not pursue it further.

to the building authority. Upon full payment of the bonds, the building authority would convey the building to the city.

The city would reimburse the building authority for costs and expenses actually incurred in the event the sale of the anticipation notes or bonds should be substantially delayed or the project abandoned. The city would also indemnify the building authority and its individual members against claims arising from their activities in relation to the municipal office building project. The city would enter into an agreement with the architect initially but would later assign that contract to the building authority.

Before the plan could be fully implemented, and before the anticipation notes were issued, the plaintiffs brought this action, asserting four claims for relief. The first claim seeks a declaratory judgment that all city resolutions and ordinances authorizing the city hall project are void, and an injunction against further action to implement the financing and construction of a new city hall. The plaintiffs assert that if the plan is implemented the city will be obligated to pay the bonds because the building authority is the alter ego of the city, and the city's agreement to pay the costs incurred by the building authority if the project is abandoned makes it an insurer of the bonds. Additionally, the plaintiffs claim the city will be obligated to pay the bonds indirectly through lease rentals, and that the challenged agreements are illegal as contrary to public policy in that they represent an attempt by the city to accomplish indirectly what it is prohibited from accomplishing directly. The gravamen of this last argument is that the city is attempting to take the very action which the voters disap-

proved in the 1978 special bond election. As no election was held to approve the building authority bond issue, the plaintiffs contend that *Colo.Const.* Art. XI, § 6 has been violated.[2]

Additionally, the plaintiffs challenge a contract between the city and an architect, obligating the city in the amount of $422,-000 for architectural services for the city hall. $21,258 of this obligation had been paid by the time of trial. The plaintiffs assert that funds have not been budgeted or appropriated for that purpose and, thus, payment of city monies under the architectural contract violates sections 29–1–102, 111 and 113, C.R.S. 1973 (1978 Repl. Vol. 12 & 1980 Supp.), prohibiting the expenditure of unbudgeted and unappropriated funds. As a further element of the first claim, the plaintiffs allege that the agreements for the services of the financial advisor, the general legal counsel, the bond attorney, the architect and the trustee bank which is to act on behalf of the bondholders were made in violation of section 31–15–712, C.R.S. 1973 (1977 Repl. Vol. 12) (1980 Supp.), which requires competitive bidding for certain city contracts.

The second and third claims for relief are not related to the municipal office building project. The second claim challenges the 1979 authorization for spending $130,000 for a public safety records system and a park patrol as contrary to section 29–1–113, C.R.S. 1973 (1977 Repl. Vol. 12), prohibiting the city from contracting for the expenditure of unappropriated funds. In the third claim, the plaintiffs contest payments by the city for the distribution to its citizens of various newsletters and reports on the basis that the expenditure of monies for such purposes is not legally authorized.

**2.** In their motion for a new trial, the plaintiffs asserted error in the trial court's rejection of their claim that the city's 25-year lease of the city hall site to the building authority and the city's agreements to reimburse the building authority for costs and expenses if the project should be abandoned and to indemnify the building authority and its members in certain circumstances violate *Colo.Const.* Art. XI, § 1, prohibiting the city from pledging its credit to aid another. The plaintiffs do not treat this question in their briefs on this appeal. As noted in the defendant's brief, this constitutional proscription is inapplicable where, as here, the city's obligations are incurred for a public purpose. *In Re Interrogatories By Colorado State Senate (Senate Resolution No. 13) Concerning House Bill No. 1247 Fifty-First General Assembly*, 193 Colo. 298, 566 P.2d 350 (1977); *McNichols v. City and County of Denver*, 131 Colo. 246, 280 P.2d 1096 (1955).

In the fourth claim for relief, the plaintiffs seek restitution from individual defendants for all of the city expenditures which the plaintiffs challenge as unlawful in their first three claims. The plaintiffs also seek exemplary damages for any illegal action taken in furtherance of the city hall project after service of the summons and complaint.

## I.

We first consider whether the city hall financing plan violates *Colo.Const.* Art. XI, § 6, which provides in pertinent part: [3]

*Local government debt.* (1) No political subdivision of the state shall contract any general obligation debt by loan in any form, ... except by adoption of a legislative measure which shall be irrepealable until the indebtedness therein provided for shall have been fully paid or discharged, specifying the purposes to which the funds to be raised shall be applied and providing for the levy of a tax which together with such other revenue, assets, or funds as may be pledged shall be sufficient to pay the interest and principal of such debt. [With an exception not applicable here] *no such debt shall be created unless the question of incurring the same be submitted to and approved by a majority of the qualified taxpaying electors voting thereon,* as the term "qualified taxpaying elector" shall be defined by statute.[4] (Emphasis added.)

We have had many occasions to consider whether construction financing devices involving various types of governmental participation offend against *Colo.Const.* Art. XI, § 6. From these cases some general principles can be distilled. A statement of some of these principles at the outset will give context to our discussion of the issues in this case.

We have adopted the special fund doctrine, succinctly described by Justice Doyle in *Perl-Mack Civic Association v. Board of Directors,* 140 Colo. 371, 344 P.2d 685 (1959) as follows:

The "special fund doctrine" ... authorizes the issuance of bonds by municipalities without being limited by [a predecessor to *Colo.Const.* Art. XI, § 6] of the Constitution of Colorado where the obligations created by the bonds are payable only out of revenues derived from the improvement built with the funds thus borrowed.

140 Colo. at 374; 344 P.2d at 687. *Accord, e. g., Allardice v. Adams County,* 173 Colo. 133, 476 P.2d 982 (1970); *Ginsberg v. City and County of Denver,* 164 Colo. 572, 436 P.2d 685 (1968); *Johnson v. McDonald,* 97 Colo. 324, 49 P.2d 1017 (1935); *Shields v. City of Loveland,* 74 Colo. 27, 218 P. 913 (1923). The special funds doctrine has been extended to permit the pledge of future revenue from an existing facility to finance extensions and improvements thereto, *Searle v. Town of Haxtun,* 84 Colo. 494, 271 P. 629 (1928), and to permit the revenue from ad valorem taxes on the increase in assessed valuation resulting from a construction project to be pledged to redeem the bonds used to finance that project. *Denver Urban Renewal Authority v. Byrne,* Colo., 618 P.2d 1374 (1980). However, where the payment sources have extended beyond the revenue from the facility to be constructed or enlarged and have involved commitment of monies otherwise available for general governmental purposes, we have found a violation of constitutional provisions restricting debt financing. *City of Trinidad v. Haxby,* 136 Colo. 168, 315 P.2d 204 (1957); *Reimer v. Town of Holyoke,* 93

---

**3.** *Colo.Const.* Art. XI, § 6 was amended to its present form in 1970, effective January 1, 1972. Previously, the constitutional constraint on city general obligation debt was found in now-repealed *Colo.Const.* Art. XI, § 8, which imposed limits on time of payment and amount of municipal "debt by loan in any form" as well as requiring voter approval.

**4.** United States Supreme Court decisions cast substantial doubt on the validity of the limitation of the franchise to qualified taxpaying electors under the equal protection clause of *U.S.Const.* amend. XIV. *See City of Phoenix v. Kolodziejski,* 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970); *Kramer v. Union Free School District,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969).

Colo. 571, 27 P.2d 1032 (1933). Likewise, we have held that, if the revenue bonds are secured by a lien on governmental property, the special fund doctrine is inapposite. *McNichols v. City and County of Denver*, 123 Colo. 132, 230 P.2d 591 (1950); *but see Allardice v. Adams County, supra.*

■ While the facts of the city's financing plan are distinguishable from these cases in that the proposed financing plan ostensibly involves obligations of the building authority rather than the city and is not directly controlled by the special fund doctrine, the critical inquiry underlying the above cases remains applicable. That inquiry is whether implementation of the proposed financing plan will in fact create a general obligation debt of the city. If that is the effect of the proposed financing plan, then voter approval is required as a condition to the constitutional validity of the city's obligations. Each of the plaintiffs' arguments is designed to persuade us on this ultimate issue, and it is to those specific arguments we now turn. With slight variation, we discuss the plaintiffs' claims in the order in which we have summarized them above.

### A.

The plaintiffs initially argue that the building authority is simply an alter ego of the city and that its separate corporate existence should be ignored, with the result that the building authority's debt is the city's debt. We disagree.

■ Where the alter ego doctrine applies, a court will disregard a corporate entity, or pierce the corporate veil, and consider the actions ostensibly taken by the corporation to be those of its shareholders. In *Fink v. Montgomery Elevator Co.*, 161 Colo. 342, 421 P.2d 735 (1966), we considered the circumstances which make that doctrine applicable and stated:

> In 1 Fletcher, Cyclopedia of Corporations, § 41.1 it is stated in this regard:

> ". . . to establish the alter ego doctrine it must be shown that the stockholders' disregard of the corporate entity made it a mere instrumentality for the transaction of their own affairs; that there is such unity of interest in ownership that the separate personalities of the corporation and the owners no longer exist; and to adhere to the doctrine of corporate entity would promote injustice or protect fraud."

161 Colo. at 350, 421 P.2d at 739; *accord, Industrial Commission v. Lavach*, 165 Colo. 433, 439 P.2d 359 (1968); *Contractors Heating and Supply Co. v. Scherb*, 163 Colo. 584, 432 P.2d 237 (1967); *Hill v. Dearmin*, Colo. App., 609 P.2d 127 (1980); *Rosebud Corp. v. Boggio*, 39 Colo.App. 84, 561 P.2d 367 (1977). Putting aside the question whether the alter ego doctrine has any application to fixing liability for corporate obligations upon parties other than shareholders,[5] the record fails to establish the essential element that the building authority is to be used to promote injustice or protect fraud.

■ The premise of the plaintiffs' argument that the plan for financing and construction of a city hall is a fraud or works an injustice upon the city's taxpayers is that it is a device to accomplish, by change of form with no change of substance, the same result which has been rejected by the voters. This premise is faulty. It is not the construction of a city hall for which voter approval is required under *Colo.Const.* Art. XI, § 6. Rather, it is the creation of a general obligation debt of the city which requires the assent of the voters. The plan submitted to and rejected by the voters would have created such a general obligation debt. The plan now proposed does not. This difference is constitutionally significant.

Nor does the financing plan work an injustice upon the purchasers of the notes or

---

5. We note that the city has some prospective interest in building authority assets, based on the building authority's agreement to transfer the municipal office building to the city when the bonds have been retired, and on a provision in the building authority's articles of incorporation that upon dissolution any property not required to pay corporate debt shall be distributed only to the city.

bonds.[6] The record reflects that the financing plan has been carefully structured to assure that the city has no obligation on the anticipation notes or the revenue bonds and that purchasers of those instruments will be made fully aware of that fact by the terms of the notes and bonds. The purchasers also will be advised that the city's lease and attendant rental obligations can be terminated at the end of any year and that, should the city elect to terminate its lease, the security for the building authority's obligations is limited to the municipal office building itself and the building authority's 25-year lease on the building site. There is no reason for concern that the purchasers of the obligations will be misled.

Because neither fraud nor injustice is present in the proposed financing plan, an essential basis for disregarding the separate corporate existence of the building authority is absent. *Id.; see generally, In Re Interrogatories By Colorado State Senate (Senate Resolution No. 13) Concerning House Bill No. 1247 Fifty-First General Assembly,* 193 Colo. 298, 566 P.2d 350 (1977) (hereinafter cited as *In Re Interrogatories (1977)*). *Allardice v. Adams County, supra; Ginsberg v. City and County of Denver, supra; Rising v. Hoffman,* 116 Colo. 63, 179 P.2d 430 (1947).

### B.

■ As an alternate ground for fixing liability on the city for the note and bond obligations which are ostensibly those of the building authority, the plaintiffs claim that the city has insured payment of those obligations. In support of this argument the plaintiffs point to a resolution of the Lakewood City Council, adopted May 29, 1979, stating in relevant part:

> The City of Lakewood, Colorado, agrees to reimburse the Lakewood Public Building Authority for costs and expenses actually incurred by the Lakewood Public Building Authority in connection with the construction of the municipal building in the event the sale of the notes or bonds is

> substantially delayed *or the project is abandoned*, such costs and expenses to include, but not by way of limitation, architects fees, counsel fees, financial advisor's fees, consultant's fees, printing costs and engineering fees and preliminary construction costs, and insurance premiums to provide the Lakewood Public Building Authority with insurance protection to include General Hazard Insurance, General Public Liability Insurance, Builder's Risk Insurance and Officers and Directors Insurance. (Emphasis added.)

The argument is that one way the project could be abandoned would be for the city to exercise its option to terminate its lease before the bonds have been redeemed. Thus, if the city did not provide funds for payment of the notes or bonds through lease rentals, it would be obligated to make such payments by reason of its undertaking to reimburse the building authority for costs and expenses actually incurred in the event the project is abandoned.

The fallacy in the plaintiffs' argument is apparent from a reading of the above-quoted city council resolution. Its plain meaning is that the reference to abandonment of the project relates to project termination before funds are available from sale of the notes and bonds. That the obligations on the notes and bonds are not within the scope of the city's reimbursement agreement is made especially clear by the omission of those large obligations from the smaller items of costs and expenses listed as examples of matters included within the city's reimbursement undertaking.

### C.

■ The only obligation of the city which will arise from the successful implementation of the financing plan for the city hall is the rental obligation on the lease. It remains to be considered whether this obligation requires voter approval under *Colo. Const.* Art. XI, § 6. We conclude that it does not.

---

**6.** We elect to bypass the question whether the plaintiffs have standing to assert a fraud upon

the purchasers of securities as a basis for their alter ego claim.

In *Heberer v. Board of County Commissioners*, 88 Colo. 159, 293 P. 349 (1930), we considered whether a county's 25-year lease rental obligation for a courthouse was violative of *Colo.Const.* Art. XI, § 6. There, as here, the lease was created incident to a plan whereby a third party would construct the facility, issue its bonds to finance such construction, and retire the bonds by applying the county's rental payments to the bond obligations. The county had the option to purchase the property after a time by payment of the balance necessary to retire the bonds. We concluded that the rental obligation did not constitute debt within the constitutional proscription, reasoning as follows:

> As the county does not own a courthouse or other suitable building, the only way in which it can furnish a place in which the business of the district court and the county can be transacted is by renting such a place. The rental provided for in the lease is to be paid monthly. Such expense is as much a necessary current expense of the county as rentals for light and water are current expenses of a city. If the monthly rentals, together with all other current expenses, are paid out of the current revenues, there is no indebtedness incurred for such expenses within the constitutional inhibition. Upon those who seek relief on the ground that an indebtedness has been incurred in excess of the constitutional limit rests the burden of showing that such an indebtedness has been incurred. As there is no showing in the complaint or in the petition in intervention that the current revenues will not be sufficient to meet all current expenses, including such rentals as they accrue, the pleadings fall short of the requirements in this respect. (Citation omitted.)

88 Colo. at 165, 293 P. at 352.

As in *Heberer*, there is no showing in the instant case that current revenues will be insufficient to meet all current expenses, including rentals as they become due. *See also Shields v. City of Loveland, supra.*

Of particular importance to our conclusion that the city's rental obligations for future years do not constitute debt in contravention of *Colo.Const.* Art. XI, § 6 is the lease provision that those obligations are contingent upon exercise of the city's renewal options. We have held that discretionary or contingent obligations are not constitutional debt. "To constitute a debt in the constitutional sense, one legislature, in effect, must obligate a future legislature to appropriate funds to discharge the debt created by the first legislature." *In Re Interrogatories (1977), supra*, 193 Colo. at 305, 566 P.2d at 355 (treating the constitutional debt limitations on the state in *Colo. Const.* Art. XI, §§ 3 and 4). *See Fladung v. City of Boulder*, 165 Colo. 244, 438 P.2d 688 (1968); *Montgomery v. City and County of Denver*, 102 Colo. 427, 80 P.2d 434 (1938).

### D.

The plaintiffs urge that we look at the elements of the city hall financing and construction plan as an integrated whole, rather than limiting our examination to the validity of the various parts of the plan in isolation. *See Allardice v. Adams County, supra.* This done, they assert, it will be apparent that the city is flouting the constitutional requirement of voter approval of the creation of general obligation debt. The plaintiffs contend that we must invalidate the financing and construction plan if form is not to triumph over substance.[7] Our view of the construction and financing plan, taken as a whole, leads us to the contrary conclusion.

■ It is indisputable that the building authority was created at the city's instance as a vehicle for financing a new city hall after the city's initial plan for general obligation bond financing had been thwarted by voter disapproval. However, there is no

---

7. We note that the use of leasing arrangements by municipalities in order to provide necessary land, buildings and equipment is not, by itself, grounds for disfavoring the arrangement. The legislature has explicitly recognized the value of such arrangement when properly employed. Section 31–15–801, C.R.S.1973 (1977 Repl. Vol. 12).

evil in seeking an alternate means of achieving a result so long as the alternate is itself consistent with the law. We do not find the building authority financing plan to be simply a new guise concealing the same substance contained in the proposal which the voters rejected. *See generally, Ginsberg v. City and County of Denver, supra.*

As noted earlier, there is a real difference between the city's proposed plan and the plan which was rejected by the voters. That difference is the absence of any obligation of the city on the anticipation notes or revenue bonds under the new plan. This absence of municipal obligations will be made known to those to whom it matters most, the prospective purchasers of the building authority's securities. *See generally, Allardice v. Adams County, supra.* The adequacy of the security and the associated commercial attractiveness of the notes and bonds as investments can be evaluated by prospective buyers in the market place on the basis of full information. The proposed plan works injustice or fraud on no one.

We are aware of the argument that, although the city's lease is terminable in form, practicalities dictate that the likelihood of termination is remote because the city hall will be specially designed to city specifications and because of the prospect, gaining substance with each rental payment, that the city will become the owner of the building when the bonds have been retired. *See* Morris, *Evading Debt Limitations with Public Building Authorities: The Costly Subversion of State Constitutions,* 68 *Yale L.J.* 234 (1958). We are unpersuaded that these practicalities should result in the characterization of terminable rental obligations as the equivalent of general obligation debt.[8] That which is practical can change in the face of exigencies or changing circumstances. The ability to terminate its lease gives the city flexibility which is

real, not illusory. We cannot say that the city will never avail itself of its termination right. As we stated in *Shields v. City of Loveland, supra* :

> The definitions of the word debt are many, and depend on the context and the general subject with reference to which it is used. 17 C.J. 1371. Its meaning in the sections of the Constitution and statutes now before us must be determined by their purpose, which was to prevent the overburdening of the public, and bankruptcy of the municipality. Clearly the revenue bonds are not within that purpose. The public can never be overburdened by that which it is under no obligation to discharge, nor can the city become bankrupt by what it does not have to pay.

74 Colo. at 32, 218 P. at 916; *accord, Perl-Mack Civic Association v. Board of Directors, supra; Ginsberg v. City of Denver, supra; see In Re Interrogatories (1977), supra.*

The plaintiffs rely on *Deti v. City of Durango,* 136 Colo. 272, 316 P.2d 579 (1957). There a non-profit corporation was formed as an instrumentality of Durango to issue bonds, acquire land, construct a community building and lease it back to Durango for a 31-year term. Durango had the right to name the directors of the non-profit corporation. The revenues of the city water system, the proceeds of the city cigarette tax, the income from parking meters and, if necessary, Durango's general fund, were committed to pay the rental. Durango could terminate the lease only by paying the amount necessary to redeem the bonds. The building, or some part thereof, was to be subleased by Durango to La Plata County. The nature of the building was not reflected by the record. We concluded that it was not to be used for any of Durango's governmental or proprietary functions. At the conclusion of the lease term the non-profit corporation would own the land and

---

**8.** There is no contention or showing here that the lease rentals exceed a reasonable amount so that the city is under a practical compulsion to exercise its renewal options to protect an investment. *See, e. g., City of Los Angeles v.*

*Offner,* 19 Cal.2d 483, 122 P.2d 14 (1942); *see generally,* Nichols, *Debt Limitations and The Bona Fide Long Term Lease with an Option to Purchase: Another Look at Lord Coke,* 9 *Urban Lawyer* 403 (1977).

building. We held that the plan created debt under *Colo.Const.* Art. XI, § 6, and that the ordinance purporting to implement the plan without the voter approval required by that constitutional provision was invalid. The contrasts between the Durango plan and the one now before us, including terminability of lease payments, governmental use, and ultimate ownership of the land and building are obvious. *Deti v. Durango, supra* only reinforces our conclusion that debt was not created by the financing plan for Lakewood's proposed municipal office building.

In short, we find no basis to hold that the city hall financing and construction plan creates relationships contrary to those which appear on its face, *i. e.*, principally, the building authority will be obligated on the anticipation notes and bonds and the city will not. Implementation of this plan without seeking voter approval fully comports with *Colo.Const.* Art. XI, § 6.

Other states which have considered similar questions under their own constitutions have concluded that utilization of a building authority as a vehicle for financing governmental buildings does not violate state constitutional constraints on creation of governmental debt. *See Steup v. Indiana Housing Finance Authority*, Ind., 402 N.E.2d 1215 (1980); *Millar v. Barnett*, 88 S.D. 460, 221 N.W.2d 8 (1974); *Berger v. Howlett*, 25 Ill.2d 128, 182 N.E.2d 673 (1962); *State v. Armory Board*, 174 Kan. 369, 256 P.2d 143 (1953); *but see Scroggs v. Kansas City*, 499 S.W.2d 500 (Mo.Sup.Ct. 1973); *State ex rel. Nevada Building Authority v. Hancock*, 86 Nev. 310, 468 P.2d 333 (1970); *City of Phoenix v. Phoenix Civic Auditorium and Convention Center Association, Inc.*, 99 Ariz. 270, 408 P.2d 818 (1965).

## II.

The plaintiffs next contend that the contract between the city and the architect violates section 29–1–113, C.R.S.1973 (1977 Repl. Vol. 12) (1980 Supp.),[9] which

prohibits the expenditure of funds in excess of appropriations. Our review of the record convinces us that this argument is not well-taken.

Section 29–1–114, C.R.S.1973 (1977 Repl. Vol. 12) specifically excepts unforeseeable expenditures from the appropriations requirement of section 29–1–113. In this case, the record reveals that the city council received the city administrator's recommendation that the present financing plan be pursued on January 25, 1979; that a gift of the property site for the proposed city hall was first officially tendered on February 12, 1979; that the city council first officially expressed its intent to proceed with the proposed financing plan on February 13, 1979; and that the building authority was formed on May 8, 1979, and formally recognized by the council on May 29, 1979. In light of that context, the plaintiffs have not adequately demonstrated that the architect's contract, first authorized by the city council on June 11, 1979, was reasonably foreseeable at the time the 1979 budget was submitted in December 1978.

The plaintiffs nevertheless contend that the city has failed to comply with the procedural requirements of section 29–1–114. That statute provides that the city resolution authorizing an unforeseeable expenditure "shall set forth in full the facts" necessitating a departure from the normal budgeting and appropriations process. The resolution admittedly fails to do this. However, we are not persuaded that this technical deficiency justifies striking down the contract, since this would create only fruitless delay and is unnecessary to protection of the substantial rights of the parties. The record reveals that in fact this technical error was being remedied at the time of trial by incorporation of an item for the architect's contract in the revised 1979 city budget.

The plaintiffs further contend that the architect's contract violates section 31–15–712, C.R.S.1973 (1977 Repl. Vol. 12) (1980

---

**9.** Execution of the challenged contract was approved by the city council on June 11, 1979. The statute was amended to its present form by L. '79 p. 1124 § 2 effective May 18, 1979. In all respects material to the dispute before us the prior version of the statute is the same as its present form.

Supp.), requiring advertising and competitive bidding with respect to public improvements contracts. That statute provides:

*Public improvements by contract-cities.* All work done by the city in the construction of works of public improvement of five thousand dollars or more shall be done by contract to the lowest responsible bidder on open bids after ample advertisement ... If no bids are received or if, in the opinion of the city council, all bids received are too high, the city may enter into negotiations concerning the contract. No negotiated price shall exceed the lowest responsible bid previously received. The city is not required to advertise for and receive bids for such technical, professional, or incidental assistance as it may deem wise to employ in guarding the interest of the city against the neglect of contractors in the performance of such work.[10]

■■■■ A close reading of section 31–15–712 discloses that its application is limited to work done *in the construction* of public works. It excepts technical, professional, or incidental assistance in guarding against contractor neglect in the performance of such work, *i. e., work done in construction.* Although the statutory exceptions could be read narrowly, we conclude from a reading of the statute as a whole that the intent of the general assembly was to require competitive bidding for only the construction work done in public improvement contracts.

We have considered the applicability of a somewhat similar prohibition in the Denver city charter to agreements for architectural services and have concluded that it does not apply. *McNichols v. City and County of Denver,* 130 Colo. 202, 274 P.2d 317 (1954). That holding is consistent with the conclusions of most other courts which have considered this question under statutes which

vary in their terminology. *See* Annot., 15 A.L.R.3d 733 (1967).

■■■ For the foregoing reasons, we also conclude that the contracts with legal counsel, the financial advisor and the trustee bank are not subject to the competitive bidding requirement.[11]

### III.

■■■ The city council in 1979 authorized by resolution the expenditure of $60,000 for a public safety records system and $70,000 for a park patrol. The plaintiffs contend that these expenditures violate section 29–1–113, C.R.S.1973 (1977 Repl. Vol. 12),[12] prohibiting the expenditure of money in excess of appropriations.

The trial court found that the monies so spent were previously budgeted, and the record supports this finding. In addition, the record contains evidence that appropriations for the disputed items were made, and the expenditures were made from the funds so appropriated. The trial court's rejection of the plaintiffs' claim that the monies were expended from prior years' surplus and not from authorized appropriations is supported by the record and so must be sustained. *E. g., Page v. Clark,* 197 Colo. 306, 592 P.2d 792 (1979); *Linley v. Hanson,* 173 Colo. 239, 477 P.2d 453 (1970).

### IV.

In their third claim for relief the plaintiffs seek to obtain a declaratory judgment and to enjoin the city from spending money for newsletters, annual reports and news releases because such expenditures are unauthorized.

The trial court found these expenditures were for city purposes and were not personal or political. It therefore concluded that the appropriations were authorized by section 31–15–302(1)(b), C.R.S.1973 (1977 Repl. Vol. 12), which allows the city council to

---

**10.** Section 31–15–712 was amended by L. '79 p. 1186 § 1 effective May 18, 1979. The statement in n. 9 is equally applicable here.

**11.** The record reflects that the preliminary costs of the project will be paid from the proceeds of the sale of the bond anticipation notes. It cannot be determined with certainty whether

all project-related expenses of the city will be reimbursed upon sale of the notes.

**12.** The city council resolution authorizing the disputed expenditure was adopted on May 14, 1979, prior to the effective date of this statute's amendment. *See* n.9, *supra.*

appropriate money for municipal purposes, and section 31–15–901(1)(b), C.R.S.1973 (1977 Repl. Vol. 12), which permits appropriations of money for certain municipal advertising.

The trial court's factual finding is supported by the record, and we agree with its conclusion that section 31–15–302(1)(b) authorizes the expenditures. We do not address the alternate ground for the trial court's ruling.

## V.

In their fourth and final claim for relief the plaintiffs seek to hold the individual defendants personally liable for reimbursement to the city for the allegedly illegal expenditures complained of in the first three claims for relief. As we have found these expenditures legal, it is not necessary to consider whether personal liability could otherwise be imposed.

We affirm the judgment of the district court.