**Lindsay E. FISCHER, Plaintiff–Appellant,**

v.

**CITY OF COLORADO SPRINGS and the City of Colorado Springs Public Facilities Authority, Defendants–Appellees.**

No. 09CA2058.

Colorado Court of Appeals, Div. II.

Sept. 16, 2010.

Lindsay E. Fischer, P.C., Lindsay E. Fischer, Colorado Springs, Colorado, for Plaintiff–Appellant.

Patricia K. Kelly, City Attorney, Shane N. White, Assistant Attorney, Colorado Springs, Colorado, for Defendants–Appellees.

Opinion by Chief Judge DAVIDSON.

In this challenge to the constitutional legitimacy of the Economic Development Agreement entered into between defendants, the City of Colorado Springs (City) and the Colorado Springs Public Facilities Authority (PFA), and the United States Olympic Committee (USOC), plaintiff, Lindsay E. Fischer, a resident of the City, appeals from the grant of a motion for judgment on the pleadings and dismissal of the complaint. We affirm in part, reverse in part, and remand.

## I. Background

### A. The Economic Development Agreement

The Economic Development Agreement (EDA) is not contained in the record on appeal. However, the following is undisputed: the City and the USOC entered into the EDA for the purpose of developing facilities for use by the USOC. To raise funds to acquire and renovate the facilities, the EDA provided for a lease purchase agreement between the City and the PFA—a nonprofit corporation operated by City officials.

Under the lease purchase agreement's terms, the City authorized the PFA to issue certificates of participation, a form of security representing a proportionate undivided interest in an agreement such as, here, a lease. *See* § 11–51–201(17), C.R.S.2010. With the proceeds, the PFA was to purchase from the City the Police Operations Center and Fire Station No. 8, and then lease them back to the City, assigning its rental income to the investors who had purchased the certificates. The police and fire stations would also serve as collateral for the certificates. The lease between the PFA and the City, however, would be annually renewable, subject to future city councils' decisions to appropriate money to fund it.

Regarding the facility to be developed by the City for the USOC, the EDA provided that the City would use the revenue from its sale of the police and fire stations to acquire and renovate a downtown building. The City would then lease the building to the USOC, either for no charge or for one dollar per year, and convey it to the USOC, for no additional cost, after thirty years.

### B. Trial Court Proceedings

Plaintiff challenged the validity of the EDA on three grounds: (1) the certificates amounted, in substance if not in form, to a contract obligating the City to commit future revenues, which is prohibited, unless first authorized by an election, by the Colorado Constitution and the City's home rule charter; (2) because the EDA provided that the City would lease the facility to the USOC, either for no charge or for one dollar per year, and convey it to the USOC after thirty years, the scheme amounted to an unconstitutional donation or grant to a private corporation; and (3) the EDA conflicted with the PFA's articles of incorporation, which require financing arrangements between the City and the PFA to be "consistent with the limitations of the Colorado Constitution and the home rule Charter of the City."

Because the EDA required the PFA to issue the certificates within forty-five days of its execution, the City requested, and the court granted, an expedited briefing schedule and judgment. After a status conference, the court agreed with the City, over plaintiff's objection, that the issues could be narrowed to whether "the City, without voter approval, [may] enter into an annually renewable lease purchase agreement providing for issuance of certificates of participation." Determining that the parties agreed as to what the lease purchase agreement provided, but disagreed about its legal effect, the court concluded that this issue was purely one of law, and could be decided on the pleadings.

Ultimately, the trial court determined that the lease purchase agreement "does not con-

stitute a general obligation debt or multiple fiscal year financial obligation." Granting the City's motion for judgment on the pleadings, the court acknowledged that "[i]t may be unlikely that the City would ever not renew the lease on the [police station] and [the fire station]," yet, it concluded, "as long as that possibility exists and is legally permissible ... future city councils are not required to appropriate funds. An election is not required."

The court then dismissed the complaint with prejudice, and plaintiff filed this appeal.

## II.   Standard of Review

■ Judgment on the pleadings is appropriate when a case's material facts are not in dispute, and "judgment on the merits can be achieved by focusing on the content of the pleadings and any facts of which the court will take judicial notice." *City & County of Denver v. Qwest Corp.,* 18 P.3d 748, 754 (Colo.2001) (quoting 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1367, at 509–10 (1990)). We note that, contrary to plaintiff's contention that the trial court here considered matters outside the pleadings, specifically, that under the EDA, the City is to sell the police and fire stations to the PFA, this same information was set forth at paragraph 26 of plaintiff's amended complaint.

■ "In considering a motion for judgment on the pleadings, a court must construe the allegations of the pleadings strictly against the movant, and it must consider the allegations of the opposing party's pleadings as true." *Smith v. TCI Commc'ns, Inc.,* 981 P.2d 690, 695 (Colo.App.1999). Thus, implicit in the trial court's grant of the City's motion here was a determination that the controlling law and undisputed facts permitted resolution of the entire matter without further discovery or introduction of evidence. *See Qwest Corp.,* 18 P.3d at 754. We review this determination, and the court's disposition of the City's motion for judgment on the pleadings, de novo. *See Bedard v. Martin,* 100 P.3d 584, 588 (Colo.App.2004).

## III.   Election Not Required

On appeal, plaintiff contends that the trial court erred in granting the City's motion for judgment on the pleadings concerning the first claim stated in his complaint: that the certificates may not be issued unless first authorized by an election.

Plaintiff concedes that "the City's answer d[id] not contest the facts stated in the plaintiff's amended complaint," yet he argues that, because a trier of fact could draw disparate inferences about the practical effect of the EDA's undisputed provisions, this matter cannot be decided solely on the pleadings. *See Koch v. Whitten,* 140 Colo. 109, 113, 342 P.2d 1011, 1013 (1959) ("Where *material* issues of fact are present which can only be determined from [ ] testimony, [a] motion for judgment on the pleadings is improper.").

Although plaintiff agrees with the City that, by its terms, the lease purchase agreement provided that the City's lease of the police and fire stations was annually renewable and, therefore, future city councils would have discretion not to fund it, he argues that the trial court failed to consider evidence that, because those facilities served vital public safety functions, the public would not tolerate a decision to surrender use and occupancy of them. That the police and fire stations served as collateral on the certificates, he contends, renders such a decision even more impracticable.

Thus, plaintiff reasons, because future city councils effectively would be obligated to appropriate money from the general fund to renew the City's lease of the police and fire stations each year, both Colorado Constitution article XI, section 6, and Colorado Springs City Charter § 7–90, prohibited the issuance of the certificates without an election. We disagree.

### A.   Legal Framework

Article XI, section 6(1) of the Colorado Constitution prohibits a political subdivision, such as the City, from "contract[ing] any general obligation debt by loan in any form" "unless the question of incurring [it] be submitted to and approved by a majority of the qualified taxpaying electors voting thereon."

Likewise, the City's home rule charter, section 7–90(d) requires voter approval in advance of the creation of any "financial obligation [of the City] ... that extends, or causes a penalty if not extended, past the fiscal year incurred without adequate present cash reserves irrevocably pledged and held for all future payments." Although plaintiff also premises a claim on section 7–80(a) of the City Charter, concerning debts payable from the proceeds of ad valorem property taxes, that provision does not appear applicable to the EDA.

As plaintiff contends, these provisions proscribe any arrangement in which the City is contractually obligated to incur a debt, the repayment of which will obligate future city councils to commit revenues from the general fund. *See, e.g., Deti v. City of Durango,* 136 Colo. 272, 274–75, 316 P.2d 579, 580–81 (1957) (where lease purchase agreement provided that city must appropriate money from its general fund each year to fund a thirty-one-year lease, it violated art. XI, § 8 (repealed and reenacted, in pertinent part, as art. XI, § 6, Jan. 1, 1972)). Such an obligation is termed "constitutional debt." *In re Interrogatories by Colorado State Senate (Senate Resolution No. 13) Concerning House Bill No. 1247,* 193 Colo. 298, 305, 566 P.2d 350, 355 (1977) ("To constitute a debt in the constitutional sense, one legislature, in effect, must obligate a future legislature to appropriate funds to discharge the debt created by the first legislature.").

■ Constitutional debt is indicated where (1) the obligation pledges future revenue; (2) the obligation requires use of revenue from a tax otherwise available for general purposes; (3) the obligation is a legally enforceable obligation against the state or subdivision in future years; or (4) appropriations in future years of funds to pay the obligation is nondiscretionary. *Glennon Heights, Inc. v. Cent. Bank & Trust,* 658 P.2d 872, 878–79 (Colo. 1983).

In keeping with these factors, Colorado's courts have also recognized that, even where practical circumstances would exert substantial social or political pressure upon future city councils to appropriate money to repay outstanding obligations, unless an agreement affirmatively requires them to do so, the obligation does not amount to constitutional debt. *Gude v. City of Lakewood,* 636 P.2d 691, 698–99 (Colo.1981).

*Gude* concerned the City of Lakewood's plan to finance construction of a new city hall. Lakewood authorized a building authority—a nonprofit corporation—to sell bond anticipation notes, and to allocate the proceeds toward construction. The building authority was to lease the completed city hall back to Lakewood, and apply the rental income to redemption of the bonds. The obligation was secured by a lien on the city hall but, upon full payment of the bonds, the building authority was to convey the building to Lakewood. *Id.* at 694–95.

Taxpayers challenged this scheme, alleging that it amounted to a general obligation debt incurred without voter approval, in violation of article XI, section 6, of the Colorado Constitution. Acknowledging that Lakewood's rental obligation to the building authority was contingent on its annual decision whether or not to renew its lease, the taxpayers nevertheless maintained that, because "the city hall [was] specially designed to [Lakewood's] specifications and because of the prospect, gaining substance with each rental payment, that [Lakewood] will become the owner of the building when the bonds [were] retired," it was extremely unlikely that Lakewood would elect to terminate its lease. *Id.* at 700. Thus, they contended, the financing plan amounted to constitutional debt, in substance, if not in form. *Id.* at 694–700.

The supreme court disagreed. Despite "practicalities dictat[ing] that the likelihood of termination is remote," it remained "unpersuaded that [they] should result in the characterization of terminable rental obligations as the equivalent of general obligation debt." *Id.* at 700. The court reasoned, "[t]hat which is practical can change in the face of exigencies or changing circumstances. The ability to terminate its lease gives [Lakewood] flexibility which is real, not illusory. We cannot say that [it] will never avail itself of its termination right." *Id.*

Other decisions analyzing similar plans to finance capital projects have yielded the

same result. *See, e.g., In re Interrogatories,* 193 Colo. at 302, 566 P.2d at 353 (no constitutional violation where obligations issued by Housing Authority were secured by a capital reserve fund into which state could, at its discretion, deposit money, but had no obligation to do so); *Allardice v. Adams County,* 173 Colo. 133, 144–45, 476 P.2d 982, 988–89 (1970) (where county issued bonds to fund construction of industrial facility, and redeemed them with revenue from lease of facility to manufacturer, no constitutional debt because county expressly disclaimed any liability to redeem bonds with money taken from the general fund); *Heberer v. Bd. of Comm'rs,* 88 Colo. 159, 165, 293 P. 349, 352 (1930) (plan to finance construction of new courthouse by private entity's sale of bonds secured by deed of trust on the courthouse, and for private entity to redeem bonds with proceeds from leasing courthouse back to county, no constitutional debt where there was "no showing in the complaint . . . that the [county's] current revenues w[ould] not be sufficient to meet [its rental obligation]"); *Colorado Criminal Justice Reform Coalition v. Ortiz,* 121 P.3d 288, 293–94 (Colo.App. 2005) (even where "failure to appropriate the necessary funds for annual lease payments would have a devastating effect on Colorado's credit rating," no constitutional debt where the General Assembly was not "bound to renew the lease annually").

### B. Application

Plaintiff contends, nevertheless, that this line of authority is not controlling here. Specifically, plaintiff argues that the EDA is distinct from other similar agreements because (1) the police and fire stations, and not the USOC's facility (on which the proceeds from the certificates are ultimately to be expended), are to serve as collateral; (2) the PFA's board of directors is composed of city officials, and thus the PFA is merely the alter ego of the City; and (3) the EDA allocated the funds raised by issuance of the certificates for use by a private entity (the USOC) rather than the public. We disagree.

#### 1. The Police and Fire Stations as Collateral

In his complaint, plaintiff alleges that the EDA initially contemplated that the facility the City planned to lease to the USOC would be mortgaged to the investors as security for the certificates, but that the investors had required that the collateral be "essentialities," from which the City would "never . . . walk away." Thus, the City substituted, and the investors accepted, the police and fire stations as collateral. This circumstance, according to plaintiff, distinguishes this case from *Gude* and similar decisions.

However, any heightened civic importance of the substituted collateral, which presumably could increase political and social pressure on future city councils to appropriate monies to fund the lease, does not change the fact that the City has the ability, under the EDA, to determine yearly whether to do so. As discussed, even if the loss of a facility, through nonpayment, could have resulted in a substantial impairment of the State's or political subdivision's functions, the factor determinative of the validity of the respective arrangements was that the governmental entity retained the discretion whether to appropriate funds from year to year. *See Gude,* 636 P.2d at 694–95 (building authority's bond obligations secured by lien on the city hall, built to municipality's specifications); *Heberer,* 88 Colo. at 162, 293 P. at 351 (bonds sold to fund construction of courthouse secured by trust deed on the property, where county obligated by statute to maintain a courthouse); *Ortiz,* 121 P.3d at 293 (high-custody correctional facility was security on lease purchase agreement).

Similarly, contrary to plaintiff's argument, in this regard, it makes no difference that the financing scheme here involves collateral other than the facility on which revenue from the sale of the bonds or securities was allocated because the City's discretion to appropriate monies remains the same.

#### 2. Alter Ego

Under the doctrine of alter ego, a court may disregard a corporate entity, or pierce the corporate veil, and consider the actions ostensibly taken by the corporation to be those of its shareholders. *See Gude* 636 P.2d at 697. In *Gude,* the building authori-

ty's corporate bylaws prohibited any of its members or directors from being an elected official or employee of the municipality. *Id.* at 694. Here, however, according to plaintiff's complaint, every member of the PFA was a City Council member, officer, or employee. Based on this, plaintiff argues, the PFA was the alter ego of the City and, therefore, the PFA's obligation to the investors to redeem the certificates could be imputed to the City, obliging the City to pay that debt.

However, it is undisputed that the certificates do not pledge any specific source of revenue for repayment. *Cf. Deti,* 136 Colo. at 274, 316 P.2d at 580 (ordinance created constitutional debt where it irrevocably pledged revenue from city water system, cigarette tax, parking meters, and general fund, as needed, to fund lease purchase agreement). Thus, even if the PFA's obligation to the investors could become the City's, the investors remain entitled only to an interest in the annually appropriated lease purchase agreement, to the extent the City chooses to fund it with appropriations from its general fund.

Although, in the event the agreement is not renewed, the police and fire stations, as collateral, could revert to the investors, that possibility, as discussed, does not render the agreement unconstitutional because it does not eliminate the City's discretion to decline to renew.

In addition, as the trial court noted, although plaintiff alleges that the EDA violates the constitution and the City's charter, his complaint is devoid of allegations that the City contemplated using the PFA to promote injustice or protect fraud. *See Gude,* 636 P.2d at 697 (to establish an alter ego, it must be shown that declining to pierce the veil would promote injustice or protect fraud).

### 3. Allocation of Proceeds from Certificates to USOC

The possibility that the USOC is the primary beneficiary of the proceeds from the PFA's sale of the certificates may be relevant to plaintiff's claim, discussed below, that the EDA provides for a grant or donation from the City to a private corporation, in violation of Colorado Constitution article XI, section 2. However, we disagree with plaintiff that whether the funds raised by the issuance of certificates are allocated to a private or public entity affects whether their issuance amounts to a multi-year fiscal obligation requiring an election. As the City points out, "[i]t is not the sale of the collateral or the construction of a building for which voter approval is required. Rather, it is the creation of an indebtedness which requires an election." *See* Colo. Const. art. XI, § 6; Colorado Springs City Charter § 7–90.

Thus, for these reasons, taking as true plaintiff's allegation that future city councils would face overwhelming political pressure to renew the lease of the police and fire stations, we conclude no material fact is in dispute because an election is not required unless there is an affirmative obligation placed upon the City to renew, which did not occur here. *Compare Gude,* 636 P.2d at 699–701, *with Deti,* 136 Colo. at 274–75, 316 P.2d at 580–81. Therefore, judgment on the pleadings on this matter was properly entered against plaintiff.

### IV. Plaintiff's Second and Third Claims

Plaintiff also argues that, in granting a judgment on the pleadings, the trial court improperly dismissed the remaining claims set forth in his complaint, specifically, that the EDA provides for an unconstitutional gift to the USOC, and that the PFA's articles of incorporation do not authorize the issuance of the certificates. We agree that further proceedings are required.

### A. Second and Third Claims Not Abandoned

■ As discussed, over plaintiff's objection, the trial court determined after a status conference that "the issue [plaintiff] ha[d] raised continually in [his] complaint is that there needs to be an election." Therefore, the court ordered the case decided solely on plaintiff's first claim, and declined to consider his second and third claims. However, contrary to the trial court's determination, we conclude that plaintiff did not abandon these

remaining claims, and is entitled to their resolution.

To support its decision to narrow this case's issues to whether an election was required, the trial court relied on plaintiff's statements in his complaint that his "purpose" was "to obtain a judicial determination of whether this intended collateralization of the [certificate] obligation requires a favorable vote to be permitted," and that, provided the City acknowledged the "vanishingly small likelihood that the City in any future year would decide not to ... pay the rent," plaintiff was open to an expedited disposition of the case based on the court's determination of whether the lease purchase agreement, "however labeled and documented, in fact require[s] appropriations from the general fund by future councils." Further, at the status conference, plaintiff agreed with the court that whether "an election is required" was the "primary thrust" of his complaint, and perhaps even "the only legal issue left."

However, in his written response to the City's motion for judgment on the pleadings on the election issue, plaintiff specifically objected to the court's conclusion that whether the City may enter into the lease purchase agreement without voter approval was dispositive of all his claims. Instead, plaintiff repeatedly directed the court's attention back to his other allegations, asserting that he was entitled to a determination of those claims.

We note, also, that plaintiff's claim that the EDA imposed a multi-year fiscal obligation on the City, and his claim that it amounted to an unconstitutional gift to the USOC, are based on distinct constitutional provisions, and the former cannot be dispositive of the latter.

Thus, we conclude that plaintiff did not abandon his other claims. *Compare Bruce v. City of Colorado Springs,* 200 P.3d 1140, 1145–46 (Colo.App.2008) (where plaintiff introduced evidence and argument in support of a claim challenging a statute's constitutionality, and a claim interpreting the same statute, but trial court only ruled on interpretation issue, case remanded for resolution of constitutional challenge); *with Nat'l Acceptance Co. v. Mars,* 780 P.2d 59, 59–60 (Colo.

App.1989) (where plaintiff's complaint alleged contract and replevin claims, but, at trial, he proceeded on contract claim and made no mention of replevin claim, replevin claim was abandoned).

### B. Remand

Because plaintiff's second and third claims are likely to involve issues of fact, as well as unresolved questions of law, we conclude, for the following reasons, that a remand of those claims, for the trial court to decide in the first instance, is required.

■ Article XI, section 2 of the Colorado Constitution provides that neither the state nor any political subdivision "shall make any donation or grant to, or in aid of ... any corporation." Here, as discussed, the EDA provides that, after the City acquires and renovates a facility for the USOC's use, the USOC shall lease that facility from the City either for no rent, or for one dollar per year. After thirty years, the USOC would receive title to the facility for no additional cost. It is undisputed that this plan would amount to a donation or grant from the City to, or in aid of, the USOC.

Asserting that it will foster urban renewal and tourism, and generate sales tax revenues in excess of the facility's cost, in its pleadings, the City justifies the USOC's occupation of the facility under the "public purpose exception." *See, e.g., In re Interrogatory on House Bill 91S–1005,* 814 P.2d 875, 882 (Colo.1991) ("[A]rticle XI, section 2 of the Colorado Constitution does not prohibit a municipality from conferring a monetary benefit on a private company in consideration of the company's undertaking a project ... as long as the expenditure by a municipality furthers a valid public purpose."); *Allardice,* 173 Colo. at 148, 476 P.2d at 990 (the public purpose exception is well established and to be liberally construed).

However, even if the benefits from this arrangement alleged by the City would be realized, Colorado appellate courts have not yet addressed whether the public purpose exception is applicable where, as here, the facility on which public funds are to be expended will ultimately be conveyed to a pri-

vate entity for negligible consideration. *See City of Aurora v. Pub. Utils. Comm'n,* 785 P.2d 1280, 1288–89 (Colo.1990) (where city subsidized private utility's project to bury power lines, no unconstitutional gift where city would receive consideration in form of expanded utility service); *Witcher v. Canon City,* 716 P.2d 445, 454 (Colo.1986) (where city leased bridge to private corporation, and allocated funds for bridge's renovation, no unconstitutional gift because the bridge and all improvements were to revert to the city upon expiration of the lease); *Denver Urban Renewal Authority v. Byrne,* 618 P.2d 1374, 1383 (Colo.1980) (where urban renewal authority authorized to construct improvements for sale or lease to private corporations or individuals, authority prohibited from selling or leasing those improvements for less than fair market value); *Allardice,* 173 Colo. at 137, 476 P.2d at 984 (where facility constructed with proceeds from sale of revenue bonds was leased to private manufacturer, no unconstitutional gift where lease provided that manufacturer pay rent "sufficient to pay all bond obligations as they become due, maintenance of and insurance on the project, and an amount ... equal to ... taxes," with option to purchase facility upon lease's expiration for $1,000).

Thus, the question whether the City's planned conveyance of the facility to the USOC after thirty years for, at most, thirty dollars, comports with article XI, section 2, is unsettled, and likely involves disputed issues of fact which need to be resolved by the trial court, for example, whether, after balancing the benefits conferred by the City on the USOC against those the City could realize through urban renewal, tax revenue, employment opportunities, or other outcomes, the conveyance serves a public purpose.

We also note that plaintiff's third claim—that the PFA's articles of incorporation do not permit the issuance of the certificates—is predicated on a conclusion that that financing arrangement is not "consistent with the limitations of the Colorado Constitution and the home rule Charter of the City." Because we

affirm the trial court's determination of plaintiff's first claim—that the lease purchase agreement between the City and the PFA is consistent with those limitations—the trial court's disposition of his second claim—that the plan to convey a facility acquired with public moneys to the USOC for little or no consideration amounts to an unconstitutional grant or donation—will be dispositive of the third.

The portion of the judgment dismissing plaintiff's claim that issuance of the certificates violated Colorado Constitution article XI, section 6 and the City Charter § 7–90 is affirmed. The part of the judgment dismissing plaintiff's remaining two claims is reversed, and the case is remanded for the trial court to reinstate that portion of the complaint and for further proceedings in accordance with this opinion.

Judge PLANK * and Judge NEY * concur.