2012 COA 125

**CASTLE ROCK BANK,**
**Plaintiff–Appellee,**

v.

**TEAM TRANSIT, LLC, d/b/a Team Transit, a Colorado limited liability company, Defendant,**

and

**Michael L. Zinna, Defendant–Appellant.**

**No. 11CA1926.**

Colorado Court of Appeals,
Div. V.

July 19, 2012.

Certiorari Dismissed Oct. 3, 2012.

Gubbels Law Office, P.C., Peter B. Goldstein, Castle Rock, Colorado, for Plaintiff–Appellee.

Robinson Waters & O'Dorisio, P.C., Steven L. Waters, Kimberly A. Bruetsch, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge LOEB.

¶ 1 In this case brought to recover on two promissory notes, defendant, Michael L. Zinna, appeals the judgment entered in favor of plaintiff, Castle Rock Bank (the Bank), after a trial to the court. Specifically, Zinna appeals the trial court's ruling that the Bank's action was timely filed under the applicable statute of limitations.

¶ 2 As a matter of first impression, we conclude that the statute of limitations begins to run on a promissory note's maturity date where, as here, the note is to be repaid in installments, is not accelerated by the creditor, and provides that a "final payment of the unpaid principal balance plus accrued interest is due and payable" on the note's maturity date. Accordingly, we affirm and remand the case for a determination of the Bank's reasonable attorney fees on appeal.

### I. Background

¶ 3 On December 18, 1996, the Bank loaned Team Transit, LLC, $100,000 (the Team Transit loan), pursuant to a promissory note signed by Michael L. Zinna, then president of Team Transit, LLC. Under the terms of the note, Team Transit was required to pay the Bank $1,378 per month beginning one month from December 18, 1996, with "the balance of the principal and interest payable 10 years from date [t]hereof."

¶ 4 On April 9, 1998, the Bank loaned Kelly A. Spooner $75,000 (the Spooner loan), pursuant to a promissory note signed by her. Under the terms of the note, Spooner was required to pay the Bank $1,295 per month beginning one month from April 9, 1998, with "the balance of the principal and interest payable 7 years from date [t]hereof."

¶ 5 On March 1, 2001, the terms of both loans were modified and new promissory notes were executed by Zinna and Spooner, who had since married. Regarding the

Team Transit loan, the principal amount on the new note was $75,671.39, Zinna and Spooner were added as co-borrowers in their personal capacities, and Spooner pledged additional collateral as security for the loan, consisting of a third deed of trust on their family home. Further, the monthly repayment schedule was changed as follows:

> 67 payments of $757.00 beginning May 18, 2001 and continuing at monthly time intervals thereafter. A final payment of the unpaid principal balance plus accrued interest is due and payable on December 18, 2006.

¶ 6 Regarding the Spooner loan, the principal amount on the new note was $48,959.15, Zinna was added as a co-borrower in his personal capacity, and the monthly repayment schedule was changed as follows:

> 47 payments of $1,243.00 beginning May 09, 2001 and continuing at monthly time intervals thereafter. A final payment of the unpaid principal balance plus accrued interest is due and payable on April 09, 2005.

¶ 7 According to testimony at trial, Zinna made two monthly installment payments on both the Team Transit and Spooner loans on May 14, 2001, and July 2, 2001, and then stopped making payments. Thereafter, the Bank received a "pay-down" of $5,000 from the proceeds of the sale of Zinna and Spooner's family home, which the Bank applied to the Team Transit loan on August 2, 2002. The Bank did not receive any further payments on either loan. At some point later, Zinna and Spooner divorced, and Spooner filed for bankruptcy.

¶ 8 On June 5, 2009, the Bank filed its complaint in this action alleging two claims for breach of contract. Regarding the Team Transit loan, the Bank alleged breach of contract against Team Transit and Zinna. Regarding the Spooner loan, the Bank alleged breach of contract against Zinna.

¶ 9 A clerk's default was entered against Team Transit, LLC, for failing to answer. Zinna answered the complaint and, as pertinent here, asserted the statute of limitations as an affirmative defense.

¶ 10 Before trial, the Bank filed a motion for summary judgment in which it argued that it was entitled to judgment as a matter of law against Zinna for the amount allegedly due on the two notes. The Bank attached documents to its motion evidencing the existence of the two loans, as well as transaction histories showing the amount still owed. In its motion, the Bank represented that the Team Transit loan went into "default" on September 20, 1997, and that the Spooner loan went into default on January 8, 2002, both for failure to make payments.

¶ 11 In response, Zinna argued that questions of material fact existed and attached an affidavit in which he stated it was his "understanding that each of the loans" had been paid "by virtue of proceeds from a loan made to [another entity in which Zinna was an investor]," the "proceeds from the sale of [Zinna and Spooner's] family home," and the "proceeds from a certificate of deposit."

¶ 12 In reply, the Bank argued that the transaction histories showed that Zinna had received credit for the proceeds from the other loan and from the sale of the family home, but there were outstanding balances still owed under both the Team Transit and Spooner loans. Regarding the certificate of deposit (CD), the Bank stated that a "[CD] *was* liquidated to pay a third loan obligation of Zinna which is not the subject of this action." The trial court denied the Bank's motion for summary judgment in a written order, finding that genuine issues of material fact existed.

¶ 13 On August 8, 2011, a one-day trial to the bench was held. The parties stipulated to the admissibility and authenticity of all the loan documents, including the original and modified promissory notes and the transaction histories described above. After the Bank presented testimony from its president, Zinna moved for judgment as a matter of law on the basis of the statute of limitations. In an oral ruling, the court rejected Zinna's statute of limitations defense. Zinna then testified, focusing mostly on his belief that his loan obligations had been fully satisfied. At the conclusion of the testimony and after considering the parties' closing arguments, the court orally ruled in favor of the Bank.

As pertinent here, the court concluded that Zinna owed $69,108.77, plus interest, on the Team Transit loan, and $45,036.69, plus interest, on the Spooner loan, and entered judgment in those amounts against Zinna on August 9, 2011.

¶ 14 This appeal followed. Shortly before briefing was completed in this appeal, the supreme court issued its opinion in *Hassler v. Account Brokers of Larimer County, Inc.*, 2012 CO 24, 274 P.3d 547, in which the court discussed at length the specific statute of limitations at issue here. Accordingly, we requested supplemental briefing from the parties on the applicability of *Hassler* to this case.

## II. Statute of Limitations

¶ 15 Zinna contends that the trial court erred by ruling that the Bank's claims were timely filed under the applicable statute of limitations. We disagree.

### A. Standard of Review

¶ 16 In determining whether the trial court properly applied the statute of limitations here and properly determined the accrual dates for the Bank's claims, we must look to sections 13–80–103.5 and 13–80–108, C.R.S.2011, and give effect to their provisions. Matters of statutory interpretation, such as this, raise questions of law that we review de novo. *Hassler*, ¶ 15, 274 P.3d at 551.

¶ 17 When construing a statute, our goal is to determine and give effect to the intent of the General Assembly. *Id.* To do so, we give the words of the statute their plain and ordinary meaning, reject interpretations that render words or phrases superfluous, and harmonize potentially conflicting provisions, if possible. *Id.; Hygiene Fire Prot. Dist. v. Bd. of Cnty. Comm'rs*, 205 P.3d 487, 490 (Colo.App.2008), *aff'd*, 221 P.3d 1063 (Colo. 2009).

¶ 18 Similarly, because our analysis also turns on the language of the promissory notes at issue, we are guided by principles of contract interpretation. Promissory notes are subject to the principles of interpretation and construction that govern contracts gen-erally. *Cache Nat'l Bank v. Lusher*, 882 P.2d 952, 956–57 (Colo.1994). Our primary goal in interpreting the promissory notes is to determine and give effect to the intention of the parties. *Id.* at 957. In determining the parties' intent, we accord the terms of the notes their plain and ordinary meaning. *Id.*

¶ 19 Because this case was tried to the court, our review of the trial court's findings of fact is highly deferential. *Citywide Banks v. Armijo*, —— P.3d ——, ——, 2011 WL 4837501 (Colo.App.2011). Accordingly, we will "defer to the court's credibility determinations and will disturb its findings of fact only if they are clearly erroneous and not supported by the record." *Lawry v. Palm*, 192 P.3d 550, 558 (Colo.App.2008). On appeal, we may uphold a correct result on any ground supported by the record, even if we do not accept the trial court's reasoning in reaching such result. *Newflower Mkt., Inc. v. Cook*, 229 P.3d 1058, 1061 (Colo.App. 2010).

### B. Law

¶ 20 The parties do not dispute that the six-year statute of limitations for actions to recover a debt, found in section 13–80–103.5, applies here. That section provides:

(1) The following actions shall be commenced within six years after the cause of action accrues and not thereafter:

(a) ... [A]ll actions for the enforcement of rights set forth in any instrument securing the payment of or evidencing any debt....

§ 13–80–103.5(1)(a); *see Hassler*, ¶ 20, 274 P.3d at 552 (applying the statutory language quoted above to an action brought to recover on a security agreement); *Mortg. Invs. Corp. v. Battle Mountain Corp.*, 70 P.3d 1176, 1184–85 (Colo.2003) (applying the statutory language quoted above to an action brought to recover on a promissory note). To determine when the cause of action "accrue[d]," we look to section 13–80–108, which, as pertinent here, provides:

A cause of action for debt, obligation, money owed, or performance *shall be considered to accrue on the date* such debt,

obligation, money owed, or performance *becomes due.*

§ 13–80–108(4) (emphasis added); *Hassler,* ¶ 17, 274 P.3d at 552.

¶ 21 Thus, when these sections are construed together, the statute of limitations for a debt owed pursuant to a promissory note begins to run when the cause of action accrues, which occurs on the date that the debt "becomes due." *Hassler,* ¶ 18, 274 P.3d at 552.

¶ 22 To determine when Zinna's debts on the two promissory notes at issue here became due, in addition to analyzing the language in the notes themselves, we must discuss the manner in which the statute of limitations applies to obligations that are to be repaid in installments. *See id.* at ¶ 22, 274 P.3d at 553. Under the general rule, a "separate cause of action arises on each installment, and the statute of limitations runs separately against each." *Id.* (quoting 31 Richard A. Lord, *Williston on Contracts* § 79:17 (4th ed.2011)); *see In re Church,* 833 P.2d 813, 814 (Colo.App.1992).

¶ 23 However, if an obligation that is to be repaid in installments is accelerated, either automatically by the terms in the parties' agreement or by the election of the creditor pursuant to an optional acceleration clause, the entire remaining balance of the loan becomes due immediately, and the statute of limitations is triggered for all installments that had not previously become due. *Hassler,* ¶ 22, 274 P.3d at 553; *Church,* 833 P.2d at 815. "In the case of an acceleration provision exercisable at the option of the [creditor], the [creditor] must perform some clear, unequivocal affirmative act evidencing his intention to take advantage of the accelerating provision." *Moss v. McDonald,* 772 P.2d 626, 628 (Colo.App.1988); *see also Hassler,* ¶ 24, 274 P.3d at 553–54.

### C. Procedural History

¶ 24 At trial, before any testimony was presented, Zinna argued that the statute of limitations barred the Bank's claims:

> I think the legal issue that comes up is— our position would be the statute of limitation runs from the date of default versus

[the Bank] would suggest it's from the date of maturity of the note. [sic]

The court reserved ruling on the issue.

¶ 25 The Bank then presented testimony from its president, who testified to several points that are pertinent here:

¶ 26 Zinna and Spooner had four loan relationships in total with the Bank: (1) the Team Transit loan; (2) the Spooner loan; (3) a $25,000 loan to Spooner that was paid in full on March 1, 2001; and (4) a $12,000 loan to Team Transit, LLC (and other corporate entities);

- The Bank sued Zinna in the present case to recover on the Team Transit and Spooner loans only;
- The Bank liquidated a CD that had been pledged as collateral for the $12,000 loan and applied the proceeds to that loan only, which satisfied Zinna's obligation as to that loan in full;
- On July 30, 2002, Zinna and Spooner sold their family home in a short sale;
- There were two senior lienholders ahead of the Bank to receive proceeds from the home sale, and "the bank agreed to take . . . $5,000 to release its lien";
- The Bank applied the $5,000 as a "paydown" to the Team Transit loan, which still had a substantial outstanding past-due balance;
- Regarding the Team Transit and Spooner loans, the Bank sent Zinna notices that "payments were seriously delinquent," but never "declar[ed] either of these two notes to be in default."
- The Bank never calculated the interest rates for the loans at the higher so-called default rate.

¶ 27 After the Bank president's testimony was completed, Zinna renewed his motion for judgment as a matter of law based on the statute of limitations. Zinna argued that "the one issue that the Court would have to determine in order to make a legal ruling on [the statute of limitations] is the date of the default of the notes." As pertinent here, Zinna then argued that the date of default occurred either when the Bank first considered the loans to be in default (on September 20,

1997, for the Team Transit loan, and January 8, 2002, for the Spooner loan); or when the Bank liquidated the CD and received the $5,000 proceeds from sale of the family home, with the "outside date[s]" of May 7, 2002, for the Spooner loan, and August 2, 2002, for the Team Transit loan. Because all these dates took place more than six years before the Bank filed suit, Zinna argued that its action was time barred using even the "outside date[s]."

¶ 28 The Bank responded that there was "no evidence that [it] ever exercised its right [to accelerate] on the note[s] and declared a default." The Bank also argued that, as holder of the promissory notes, it could determine when the notes were in "default" and that it had no obligation to do so before the maturity date: "As long as it[']s up to the holder of the note, the holder of the note ... can decide, and in this particular case ... there's no evidence that the holder of the note made that determination at an earlier date."

¶ 29 In its oral ruling, the court rejected Zinna's statute of limitations defense. The court discussed the Bank president's testimony, noting that he had testified that the Bank never sent Zinna a notice that the loans were actually in "default," but, rather, the Bank sent Zinna notices that the loans were "delinquent." Distinguishing between these two terms, the court reasoned that the statute of limitations would not start running until the Bank formally declared the notes in "default," rather than simply informing Zinna that the loans were "delinquent":

> In other words, the loans are delinquent until somebody declares that they are, actually, in default and action is taken. The delinquency of the loan is the loans are past due, they haven't been paid, the bank is attempting to collect money through, perhaps, less formal means than a Court process. But once someone indicates the loans are in default and the bank is, then, taking action on the default, that's the date that the Court has to be concerned with or the date of the maturity.

Accordingly, based on its reasoning that "delinquency status is different than a default status," and because the Bank never formally declared the loans in default, the court rejected Zinna's statute of limitations defense.

¶ 30 At the close of evidence, the court made additional remarks regarding when the loans were in "default" and the statute of limitations. The court found that the Bank never calculated interest at the higher "default rate" because it "never treated the notes as in default." Further, the court also noted that it had reviewed the promissory note documents and specifically the optional acceleration clauses and found that, "in light of the language in [the notes], there was no action taken by the bank on the issue of default, [because] [it] did not seek or declare the loan was in default."

## D. Analysis

¶ 31 On appeal, Zinna essentially contends that the trial court erred because it miscalculated the appropriate accrual dates under which the Team Transit and Spooner loans became due. Specifically, Zinna contends that the appropriate accrual dates from which the statute of limitations would have begun running are either when the loans first went into "default" because of missed payments, or when the Bank liquidated the CD, received proceeds from the sale of the family home, and applied those proceeds to the outstanding loan balances. We reject Zinna's contentions.

¶ 32 Zinna's contentions on appeal appear to raise an issue of first impression in Colorado: when does the statute of limitations begin to run on a promissory note that is to be repaid in installments, was not accelerated by the creditor, and provides that a "final payment of the unpaid principal balance plus accrued interest is due and payable" on the note's maturity date?

¶ 33 We conclude that, under the circumstances here (including the terms of the promissory notes at issue), the statute of limitations began running on the notes' maturity dates, under which Zinna was obligated to make "a final payment of the unpaid principal balance plus accrued interest" on December 18, 2006, for the Team Transit loan, and on April 9, 2005, for the Spooner loan. Accordingly, because the Bank filed suit

within six years of the notes' maturity dates, we affirm the trial court's ruling that the Bank's suit was timely filed, although we do so based on reasoning different from that expressed by the trial court.

¶ 34 To reach this conclusion, we proceed through three analytical steps. First, we discuss *Hassler v. Account Brokers of Larimer County, Inc.*, in which our supreme court announced the legal framework for analyzing how the statute of limitations applies to an installment payment security agreement that was validly accelerated by the creditor. Second, we conclude that, as a matter of law, the Bank did not accelerate the notes by either liquidating the CD or applying the proceeds from the sale of the family home to the loans. Third, we analyze the terms of the promissory notes at issue and conclude that the statute of limitations began running when Zinna was obligated to make a "final payment of the unpaid principal balance plus accrued interest" on the notes' respective maturity dates.

### 1. *Hassler*

¶ 35 In *Hassler*, a buyer financed the purchase of a vehicle through a loan from a credit union and signed a security agreement setting forth the terms of their agreement. *Hassler*, ¶ 6, 274 P.3d at 549. The security agreement obligated the buyer to pay monthly installments and gave the credit union a security interest in the vehicle he had purchased. *Id.* The security agreement contained an acceleration clause, which authorized the credit union to accelerate the loan and require immediate payment of the outstanding balance if the buyer was in "default." *Id.* at ¶ 7, 274 P.3d at 549. "Default" was defined in the agreement as "break[ing] any promise [the buyer] make[s] under this agreement." *Id.* In its recitation of the facts, the court did not state whether the security agreement contained a maturity date. *See id.* at ¶¶ 6–13, 274 P.3d at 549–51.

¶ 36 At some point, the buyer stopped making monthly payments. *Id.* at ¶ 8, 274 P.3d at 550. The credit union eventually repossessed the vehicle and sent the buyer a letter, demanding that he pay the full outstanding balance due on the loan. *Id.* Sever-

al months after the credit union repossessed the vehicle, it sold the vehicle and applied the proceeds to the buyer's loan. *Id.* at ¶¶ 8–9, 274 P.3d at 550. However, because the loan still had an outstanding balance, the credit union assigned the buyer's remaining debt to a collection agency, which sued him about five years and eleven months after the credit union had sold the vehicle, but more than six and a half years after the credit union had repossessed the vehicle and sent the buyer the letter. *Id.* at ¶ 10, 274 P.3d at 550. On appeal, the issue was whether the statute of limitations began to run on the date the credit union sold the vehicle, or the date that the credit union repossessed the vehicle and sent the buyer the letter demanding full payment. *Id.* at ¶ 14, 274 P.3d at 551.

¶ 37 The court held that the six-year statute of limitations for an action based upon the rights set forth in a security agreement begins to run on the date that the cause of action accrues, which is the date that the debt "becomes due" by the terms of the parties' agreement. *Id.* at ¶¶ 4, 14, 274 P.3d at 549, 551. For security agreements that are to be repaid in installments, and for installment agreements that are validly accelerated, the court held as follows:

> For a security agreement that is to be repaid in installments, the debt for each installment becomes due on the date that each installment is missed. Once an installment security agreement is validly accelerated, however, the entirety of the remaining balance becomes due and therefore the cause of action to collect the entire debt accrues.

*Id.* at ¶ 4, 274 P.3d at 549.

¶ 38 The court further held that, as a matter of law, the credit union's repossession of the vehicle coupled with its demand for full payment constituted affirmative acts expressing "a clear, unequivocal intent to accelerate all remaining installments due under the parties' agreement." *Id.* at ¶ 26, 274 P.3d at 554. Therefore, because the credit union accelerated the remaining installments more than six years before the collection agency filed suit, the court held that the suit was time barred. *Id.* at ¶ 39, 274 P.3d at 558.

¶ 39 We note that the supreme court did not resolve the issue whether the credit union's claim for the accelerated debt accrued on the date that the debt was accelerated, or on the date that the credit union was first permitted to accelerate the debt because, under either scenario, the credit union's claim accrued more than six years before the suit was filed. *Id.* at ¶ 38 n. 11, 274 P.3d at 557 n. 11; *see also Lovell v. Goss,* 45 Colo. 304, 311–12, 101 P. 72, 74–75 (1909).

¶ 40 According to Zinna's assertions on appeal, the Team Transit and Spooner loans first went into default on September 20, 1997, and January 8, 2002.[1] In the alternative, Zinna asserts that at the latest, the Bank exercised its option to accelerate the Team Transit loan on August 2, 2002 (when it applied the $5,000 proceeds from the sale of the family home to the Team Transit loan), and the Bank exercised its option to accelerate the Spooner loan on May 7, 2002 (when it allegedly liquidated the CD and applied the proceeds to the Spooner loan). As argued by Zinna, under either scenario, the Bank's claims would have accrued more than six years before the Bank's suit was filed. Under those circumstances, we would not be confronted with the issue left undecided in *Hassler.*

¶ 41 If, under *Hassler,* the Bank expressed "a clear, unequivocal intent to accelerate all remaining installments due" in 2002, as Zinna contends, then the Bank's claims would have accrued when the Bank elected to accelerate the debts. Because the alleged date of acceleration on each loan would be more than six years before the Bank filed suit, the

Bank's claims here would be time barred. *See Hassler,* ¶ 38, 274 P.3d at 557.

¶ 42 Accordingly, we turn next to the issue whether, based on the record before us, the Bank exercised its option to accelerate the notes and conclude it did not.

### 2. Acceleration

¶ 43 On appeal, Zinna contends that the court erred by stating "that the loans were not in default even when the Bank liquidated a CD that was pledged as collateral and when it accepted a payment from the foreclosure of real property also securing the loans." In response, the Bank contends that "[a]cceleration of [Zinna's] indebtedness under the terms of the Notes simply never happened." In reply, Zinna argues that we should not consider the Bank's acceleration argument, because "[t]he Bank never suggested to the [trial court] that it was required to accelerate the promissory note[s] before the statute of limitations would commence running."

■ ¶ 44 At the outset, we reject for two reasons Zinna's argument that we should not consider the Bank's contention on its merits because it was not raised in the trial court. First, in our view, his argument is either based on semantics or on a fundamental misunderstanding of his own contention on appeal. On appeal, Zinna contends that the court erred because it should have found that the statute of limitations began running either when the Bank liquidated the CD or when it accepted the $5,000 payment from the sale of the family home.[2] Under *Hassler,* Zinna's contention is essentially an ar-

---

1. As discussed above, the Bank referenced these dates in its motion for summary judgment as the dates the loans first went into default, and Zinna adopts these dates for his own purposes on appeal. However, based on the record before us, there is no indication of how the Bank calculated these dates, and the record simply does not provide any support for determining that these dates (to the exclusion of other possible dates) are accurate. We further question whether the Bank could, as a matter of law, consider Zinna to be in default under the Team Transit loan from September 20, 1997, after that loan was modified and a new promissory note executed in 2001. The parties do not address this issue in their respective arguments. In any event, because

these issues are irrelevant to our analysis, we need not dwell on these points.

2. In his supplemental brief on appeal, Zinna contends for the first time that the Bank expressed an unequivocal intent to accelerate the notes by submitting to the Small Business Administration (SBA) "a request for payment of the loan based upon the SBA's guarantee." Because Zinna did not make this argument in the trial court or in his opening or reply briefs on appeal, we decline to consider it. *See Sterenbuch v. Goss,* 266 P.3d 428, 435 (Colo.App.2011); *Knappenberger v. Shea,* 874 P.2d 498, 503 (Colo.App. 1994).

gument that the Bank expressed "a clear, unequivocal intent to accelerate all remaining installments due" under the terms of the promissory notes at issue, and that the statute of limitations should have run from those dates.

¶ 45 Second, we conclude that this issue was raised in the trial court. During closing argument, the Bank argued as follows:

[The notes] give[ ] the lender the option to declare the principal amount plus interest under the note and all present and future obligations ... due and payable. So, it was within this—at all times, within the discretion of the lender to determine when the note was in default, and that simply bolsters the argument that ... [the Bank] didn't declare the note in default until [it] decided to bring this legal action to recover on the note.

¶ 46 Thus, although Zinna focuses on when the loans were in "default," and the Bank seemingly focuses on whether the loans were accelerated, both Zinna and the Bank are arguing about the same thing: whether the statute of limitations began running when the Bank liquidated the CD or received proceeds from the sale of the family home and allegedly applied those proceeds to the outstanding loan balances. To analyze this issue, we necessarily look to the language of the promissory notes and the trial court's findings of fact.

¶ 47 As pertinent here, the two promissory notes contained identical optional acceleration clauses, which gave the Bank the option of accelerating the debt owed under the notes if an "Event of Default" occurred. An "Event of Default shall occur," under the notes, when the borrower "fails to make any payment on th[e] Note[s] or any other indebtedness to Lender when due." The optional acceleration clauses provided, in pertinent part, that "[i]f there is an Event of Default," the Bank "will be entitled to exercise one or more of the following remedies without notice or demand," including "to declare the principal amount plus accrued interest under th[e] Note[s] ... immediately due and payable in full."

¶ 48 At trial, Zinna argued that the Bank declared the notes in default by applying the proceeds of a liquidated CD and the sale of the family home to the outstanding loan balances. However, regarding the CD, the Bank president testified that the proceeds from the liquidated CD were applied to the $12,000 loan, which was a different loan from the Team Transit and Spooner loans and is not at issue on appeal. Regarding the sale of the family home, the Bank president testified that it was sold on a short sale, that the Bank was a junior lienholder behind two other lienholders, and that it "agreed to take ... $5,000 to release its lien" and applied those proceeds as a "pay-down" to the Team Transit loan. The Bank president's testimony on these points was essentially undisputed.

¶ 49 After the close of evidence, the trial court found that the liquidated CD "was not attributable or not applied to the Spooner loan." Although the court did not make any explicit findings of fact regarding the family home sale, it incorporated the $5,000 "pay-down" into its calculation of how much debt was still owed under the notes.

¶ 50 Given the trial court's findings of fact and the record before us, we conclude, as a matter of law, that the Bank did not accelerate the promissory notes, because its actions did not constitute a clear, unequivocal intent to accelerate all remaining installments due on either of the loans at issue in this case. *See Hassler*, ¶ 24, 274 P.3d at 553–54; *Moss*, 772 P.2d at 628.

¶ 51 Regarding the liquidation of the CD, the record clearly demonstrates that the proceeds from the liquidated CD were not applied to the Team Transit and Spooner loans. The transaction histories of the Team Transit and Spooner loans support the Bank president's trial testimony that the proceeds from the liquidated CD were not applied to those loans, but were instead applied to the independent $12,000 loan. Accordingly, the Bank could not have, as a matter of law, expressed an unequivocal intent to accelerate the Team Transit and Spooner loans by liquidating the CD.

¶ 52 Regarding the proceeds from the sale of the family home, nothing in the record suggests that the Bank expressed a clear, unequivocal intent to accelerate either of the

loans by accepting the $5,000 "pay-down" from the sale of the family home to release its lien. Rather, the Bank president's testimony was that the family home was sold on a short sale, not due to a foreclosure action, and his testimony suggested that the $5,000 "pay-down" came about as a settlement among Zinna, the Bank, and the two other more senior lienholders. *See Bauer Dev. Co. v. Nu–West, Inc.*, 757 P.2d 1149, 1150 (Colo. App.1988) (holding that the lender's actions in sending letters that were "merely threats to foreclose" did not constitute a "clear, unequivocal affirmative act" to accelerate). The transaction histories support the Bank president's testimony and show that, after the $5,000 was applied as a "pay-down" to the Team Transit loan, a substantial outstanding balance still remained. *See Hassler*, ¶¶ 14, 26 n. 8, 274 P.3d at 551, 554 n. 8.

¶ 53 Accordingly, we conclude that the Bank, as a matter of law, did not express a "clear, unequivocal intent" to accelerate the Team Transit and Spooner loans. Having so concluded, we must next determine when Zinna's debt became due under the terms of the promissory notes themselves.

### 3. The Promissory Notes

¶ 54 Zinna contends that the loans were in "default" when he first failed to make monthly installment payments and that the statute of limitations began running at those times, which were more than six years before the Bank filed suit. Specifically, Zinna contends that, because the promissory notes defined an "Event of Default" as a failure to make any payment when due, then "the terms of the promissory notes themselves dictate that the statute of limitation begins to run from the date that payments were not made."

¶ 55 We conclude, under the circumstances of this case, including the express terms of the promissory notes at issue here, that the statute of limitations began running when Zinna was obligated to make "a final payment of the unpaid principal balance plus accrued interest" on the notes' maturity dates.

¶ 56 As discussed above, the statute of limitations for a debt owed under a prom-issory note begins to run when the cause of action accrues, which occurs on the date that the debt "becomes due" by the terms of the parties' agreement. *Hassler*, ¶ 14, 274 P.3d at 551. Normally, for promissory notes that are to be repaid in installments, as here, a "separate cause of action arises on each installment and the statute of limitations runs separately against each." *Id.* at ¶ 22, 274 P.3d at 553; *accord Church*, 833 P.2d at 814. However, both notes at issue here also provided that Zinna was obligated to make a "final payment" of the "unpaid principal balance plus accrued interest" on the notes' maturity dates. Accordingly, we must determine when the statute of limitations began running on promissory notes that were to be repaid in installments, were not accelerated, and provided that a "final payment of the unpaid principal balance plus accrued interest is due and payable" on the notes' maturity dates.

¶ 57 Some Colorado cases referencing maturity dates suggest, albeit obliquely, that a claim on a promissory note accrues, and thus the statute of limitations begins running, either when there is a default on the note or when the note matures. For instance, in *Mortgage Investments Corp.*, 70 P.3d at 1184, our supreme court stated as a black-letter principle of law that a "claim for relief on a promissory note accrues the day the note matures or the date of default." Similarly, in *Tivoli Ventures, Inc. v. Bumann*, 870 P.2d 1244 (Colo.1994), the supreme court stated that a "claim for relief on a promissory note accrues the day after the note matures." *Id.* at 1246. However, neither case addresses the concept of a maturity date in any detail, and neither case discusses how a maturity date interacts with the general rule applicable to promissory notes that are to be repaid in installments.

¶ 58 It seems clear that a debt on a promissory note "becomes due" on the note's "maturity date." *See Black's Law Dictionary* 452 (9th ed.2009) (defining "date of maturity" as the "date when a debt falls due, such as a debt on a promissory note or bond"); *see also* U.S. Dep't of the Treasury, Comptroller of the Currency Adm'r of Nat'l Banks, *Dictionary of Banking Terms and*

*Phrases,* http://www.helpwithmybank.gov/dictionary/index-dictionary.html#M (last visited July 3, 2012) (defining "maturity" as "[t]he date on which the principal balance of a loan, bond, or other financial instrument becomes due and payable"). Nevertheless, we have not found any Colorado cases interpreting a promissory note that is to be repaid in installments, was not accelerated, and expressly required the borrower to pay the "unpaid principal balance plus accrued interest" on the note's maturity date, as here.

¶ 59 In light of the foregoing, and as with any legal issue that is determined by the express terms of the parties' agreement, we turn next to the specific language of the promissory notes at issue, which necessarily controls our analysis. *See Hassler,* ¶ 14, 274 P.3d at 551; *Cache Nat'l Bank,* 882 P.2d at 956–57. The primary goal of contract interpretation is to determine and give effect to the parties' intent, which we do by according the terms in the contract their plain and ordinary meaning. *Cache Nat'l Bank,* 882 P.2d at 956–57.

¶ 60 As discussed above, Zinna was obligated to the Bank on two promissory notes for the Team Transit loan and the Spooner loan. Regarding the Team Transit loan's modified repayment schedule, the promissory note provided, in relevant part:

> 67 payments of $757.00 beginning May 18, 2001 and continuing at monthly time intervals thereafter. *A final payment of the unpaid principal balance plus accrued interest is due and payable on December 18, 2006.*

(Emphasis added.) The note referenced the December 18, 2006 date as the note's "maturity date."

¶ 61 Regarding the Spooner loan's modified repayment schedule, the promissory note provided, in relevant part:

> 47 payments of $1,243.00 beginning May 09, 2001 and continuing at monthly time intervals thereafter. *A final payment of the unpaid principal balance plus accrued interest is due and payable on April 09, 2005.*

(Emphasis added.) The note referenced the April 9, 2005 date as the note's "maturity date."

¶ 62 In its oral ruling, the trial court found that the statute of limitations did not begin running until the loans were formally declared in "default," which occurred when "there's [either] a determination made by the bank or a determination made by the Court." The court surmised that such determination took place when the "Clerk's Notices of Default entered in this litigation [were filed] sometime after the litigation was filed."

¶ 63 We affirm the trial court's ultimate conclusion that the Bank's claims were not barred by the statute of limitations, but we disagree with its reasoning. Instead, we conclude that the plain and ordinary meaning of the terms of the promissory notes at issue compels the conclusion that the "unpaid principal balance plus accrued interest" was due and payable by Zinna on December 18, 2006, for the Team Transit loan, and April 9, 2005, for the Spooner loan. In our view, the clause requiring Zinna to pay the "unpaid principal balance plus accrued interest" due on the loans means exactly what it says: Zinna was obligated to pay the unpaid principal balance plus interest that was still outstanding on December 18, 2006, for the Team Transit loan, and April 9, 2005, for the Spooner loan. *See Cache Nat'l Bank,* 882 P.2d at 956–57. The promissory notes do not state that Zinna was simply obligated to pay a final monthly installment payment of $757 and $1,243 on those dates. Instead, the promissory notes contain broader language that required Zinna to make "a final payment" of the *"unpaid principal balance plus accrued interest,"* which presumably could range from $0 (had Zinna already paid the loans in full) or the entire principal plus accrued interest (had Zinna never paid a monthly installment). Moreover, the December 18, 2006 and April 9, 2005 dates were specifically referred to in the promissory notes as "maturity dates," which term means the "date when a debt falls due." *See Black's Law Dictionary* at 452.

¶ 64 Thus, given the plain meaning of the terms in the promissory notes, Zinna was required to pay the "unpaid principal balance

plus accrued interest" on December 18, 2006, and April 9, 2005, for the Team Transit and Spooner loans, respectively. Accordingly, by the terms of the parties' agreements, we conclude that the applicable six-year statute of limitations began running when Zinna's "final payment[s] of the unpaid principal balance[s] plus accrued interest" became due on the notes' maturity dates of December 18, 2006, and April 9, 2005. *See Hassler*, ¶ 14, 274 P.3d at 551 (holding that "the statute of limitations for the recovery of a debt ... is triggered whenever the debt 'becomes due' *by the terms of the agreement"*) (emphasis added); *Mortgage Invs. Corp.*, 70 P.3d at 1184; *Tivoli Ventures, Inc.*, 870 P.2d at 1246.

¶ 65 Therefore, under the promissory notes at issue here, the Bank had essentially three options to recover on the notes. First, the Bank could have accelerated the notes pursuant to its optional acceleration clause and demanded payment of both loans in full. Second, the Bank could have sued separately on each missed installment payment for the amount of that specific installment within six years from the date that each payment was missed. *See Hassler*, ¶ 22, 274 P.3d at 553; *Church*, 833 P.2d at 814. Third, as it did here, the Bank could sue for the "final payment of the unpaid principal balance plus accrued interest" on each note, in which case the statute of limitations began running from the dates the "unpaid principal balance" became due, which occurred on the notes' maturity dates of December 18, 2006, and April 9, 2005.

¶ 66 Although not binding authority, we have found one out-of-state case that is analogous and supports our conclusion here. In *Anton A. Vreede, P.C. v. Koch*, 94 N.C.App. 524, 380 S.E.2d 615 (1989), the plaintiff loaned the defendants $15,000 on October 20, 1978, pursuant to the terms of a promissory note that obligated the defendants to repay the principal plus interest in monthly payments of $165.81 until the principal and interest were paid in full. *Id.* at 616. The note also provided that "any unpaid balance, including any unpaid interest, shall be due and payable on the first day of October 1985." *Id.* The defendants made monthly installment payments for about fifteen months, but

then stopped. *Id.* On June 16, 1987, the plaintiff sued the defendants to collect the unpaid principal and interest. *Id.* On appeal, the issue was whether the applicable three-year statute of limitations began to run from the date that the defendants first failed to pay monthly installments (with the statute of limitations running separately for each missed installment payment), or whether the statute of limitations began running from October 1, 1985, when the unpaid balance and interest became due. *Id.* at 617.

¶ 67 The court concluded that the "three-year statutory period did not begin to run until 1 October 1985, the date upon which [the] defendants' final performance was due." *Id.* The court recognized the general rule applicable to installment contracts, but recognized an "exception" to this general rule. *Id.* The court reasoned that future performance of the parties' contract was possible, because there was no evidence that the plaintiff had treated the defendants' failure to pay as a total repudiation of their agreement, and because the defendants could still fulfill their obligations under the agreement by paying "any unpaid balance, including any unpaid interest" on October 1, 1985. *Id.* at 618. Accordingly, reasoning that the "[p]laintiff should not be penalized ... because [the] plaintiff elected to wait to see whether [the] defendants could fulfill their obligation in the future," the court held that the plaintiff's suit, which was filed within three years of October 1, 1985, was not time barred under the applicable statute of limitations. *Id.*

¶ 68 We find *Vreede* analogous and persuasive here. As in *Vreede*, there is no evidence in the record suggesting that the Bank treated Zinna's missed payments as a total repudiation of their agreements. Moreover, continued performance by Zinna was possible here, despite his missing several payments, provided he made a "final payment of the unpaid principal balance plus accrued interest" on each of the notes, on December 18, 2006, and April 9, 2005, respectively.

¶ 69 Finally, contrary to Zinna's argument on appeal, we observe briefly that public policy supports our conclusion. The Bank should not be penalized and barred from recovering the unpaid balance of Zinna's

debts simply because it waited to see whether Zinna could fulfill his obligations under the notes, in which he agreed to make a "final payment of the unpaid principal balance plus accrued interest" on the notes' maturity dates. *See First Nat'l Bank v. Park,* 37 Colo. 303, 307, 86 P. 106, 107 (1906) ("A creditor would scarcely make a contract which would against his option mature [the] note every time the maker saw fit to be delinquent in the payment of interest."). Nor is there any danger, as argued by Zinna, that the result here gives creditors an indefinite amount of time to file a lawsuit. Rather, under the circumstances here, the Bank was required to (and did) bring its lawsuit within six years of the maturity dates of the promissory notes.

### E. Conclusion

¶ 70 In sum, applying the legal framework in *Hassler,* we conclude that the Bank, as a matter of law, did not exercise its option to accelerate the promissory notes at issue, and, by the terms of those notes, the statute of limitations began to run when Zinna's "final payment of the unpaid principal balance plus accrued interest" became due on the notes' respective maturity dates.

¶ 71 Here, the Bank filed suit on June 5, 2009, within six years of December 18, 2006, and April 9, 2005. The Bank's suit to collect the "unpaid principal balance plus accrued interest" on each note is, therefore, not barred under the six-year statute of limitations in section 13–80–103.5.

### III. Attorney Fees

¶ 72 The Bank also requests an award of attorney fees incurred in bringing this appeal, as allowed under the terms of the promissory notes. We conclude that such an award is appropriate.

¶ 73 The notes state, in pertinent part, that Zinna agreed to pay the Bank's "fees and costs of attorneys" that are incurred by the Bank "in collecting any amount due or enforcing any right or remedy under [these] Note[s]."

¶ 74 Therefore, because of our conclusion that the Bank's claims were timely filed, and because Zinna does not otherwise challenge the trial court's judgment in favor of the Bank, we further conclude that the Bank is entitled to an award of reasonable attorney fees incurred on appeal. However, because the trial court is in a better position to determine the amount of reasonable attorney fees incurred by the Bank in defending this appeal, we exercise our discretion and remand the case to the trial court for further proceedings on that issue. *See* C.A.R. 39.5; *Vessels v. Hickerson,* 2012 COA 28, ¶¶ 63–66, — P.3d —, 2012 WL 503664.

¶ 75 The judgment is affirmed, and the case is remanded for a determination of the Bank's reasonable attorney fees on appeal.

Judge HAWTHORNE and Judge MILLER concur.