2013 COA 154

**TODD CREEK VILLAGE METROPOLITAN DISTRICT, Plaintiff–Appellee,**

v.

**VALLEY BANK & TRUST COMPANY, Defendant–Appellant.**

**Court of Appeals No. 12CA1302**

Colorado Court of Appeals,
Div. VI.

Announced November 21, 2013

Rehearing Denied December 19, 2013

Carver Schwarz McNab Kamper & Forbes, LLC, Peter C. Forbes, Denver, Colorado, for Plaintiff–Appellee.

Snell & Wilmer L.L.P., Michael E. Lindsay, Jessica E. Yates, Denver, Colorado, for Defendant–Appellant.

Hogan Lovells U.S. LLP, Craig A. Umbaugh, David A. DeMarco, Denver, Colorado, for Amicus Curiae Colorado Bankers Association.

Heizer Paul LLP, Dean C. Heizer, Denver, Colorado, for Amicus Curiae Colorado Municipal Bond Dealers Association.

Opinion by JUDGE ROTHENBERG [*]

¶ 1 At issue in this appeal is whether the plaintiff, Todd Creek Village Metropolitan District (the special district), had the constitutional and statutory authority to enter into loans and security agreements with the defendant, Valley Bank & Trust Company (the bank), and to pledge the district's assets as collateral. Because we conclude the special district had such authority, we reverse the judgment invalidating the loan and security agreement executed by the special district.

---

[*] Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24-51-1105, C.R.S. 2013.

## I. Background

¶2 The parties stipulated to the salient facts. The special district is located near Brighton in Adams County and was formed in 1996. As required by the Special District Act, sections 32–1–101 to –1807, C.R.S.2013, the special district submitted a service plan to the Adams County Board of Commissioners. This service plan generally outlined the special district's financial plan and its proposed methods of raising revenue.

¶3 The special district also submitted fifteen ballot questions to its eligible electors, all of which were approved. One of the ballot questions proposed that the special district raise $5 million in "general obligation debt or other obligations."

¶4 In 2000, the special district modified its service plan and submitted additional ballot questions to its voters which provided for additional financing primarily through the use of revenue bonds.

¶5 In 2003, the bank and the special district entered into a loan agreement for $600,000. The loan proceeds were used primarily to fund the costs of constructing a reverse osmosis water treatment facility and lift station, to construct a non-potable water distribution line, and make other improvements to the Smith Reservoir.

¶6 In 2004, the special district executed and delivered to the bank a $1.4 million line-of-credit promissory note with a one-year maturity date (the loan). The loan was secured by a deed of trust that encumbered real property owned by the special district, including two reservoirs, one well site, and four easements. Immediately after executing the 2004 loan, the bank advanced on its line-of-credit to pay off the 2003 promissory note. Thus, the 2004 loan was basically a refinancing of the transaction that had used the bank's funds to purchase the reverse osmosis water treatment facility and lift station, and to defray certain of the special district's operating costs.

¶7 During the next seven years, the loan was extended and modified, and at various times, the parties agreed to substitutions of the collateral that secured the loan.

¶8 By December 1, 2011, the amount owed to the bank was slightly less than $1 million with interest accruing at approximately $200 per day. However, in late 2011, the parties were unable to agree to the terms of an extension. The special district filed this action seeking a declaratory judgment that the loans were invalid and did not need to be repaid because they violated the special district's service plan and the requirements of Colo. Const. art. XI, section 6. The district court agreed and granted the special district's request for declaratory judgment.

## II. Issues Presented

¶9 Three issues are raised in this appeal: (1) whether Article XI, section 6(1) of the Colorado Constitution requires that a municipal district seeking voter approval of a general obligation debt must identify the specific collateral that will be pledged to secure the debt; (2) the extent to which a special district's financing arrangements must be provided for in the special district's service plan; and (3) the nature of equitable relief that may be awarded to a lender where the loans incurred by a special district amounted to constitutionally impermissible general obligation debt, in contravention of Article XI, section 6(1) of the Colorado Constitution.

## III. Standard of Review

¶10 All of the relevant determinations made by the district court involved questions of law, and therefore our review is de novo. *Danielson v. Dennis*, 139 P.3d 688, 691 (Colo. 2006) (applying de novo review to question of constitutional interpretation); *Plains Metro. Dist. v. Ken–Caryl Ranch Metro. Dist.*, 250 P.3d 697, 699 (Colo.App.2010) ("The trial court's ruling ... rested on an interpretation of both this specific service plan and the law governing special districts. Our review of both points is de novo."). Hence, we apply time-honored principles of statutory interpretation.

¶11 We first determine whether the statute or constitutional provision has a plain and unambiguous meaning. *Bruce v. City of Colorado Springs*, 129 P.3d 988, 992 (Colo.2006). We read the statutory scheme as a whole to give "consistent, harmonious[,] and sensible

effect to all of its parts." *Colo. Water Conservation Bd. v. Upper Gunnison River Conservancy Dist.*, 109 P.3d 585, 593 (Colo.2005) (internal quotation marks omitted); *see also Havens v. Bd. of Cnty. Comm'rs*, 924 P.2d 517, 523 (Colo.1996). We also "consider the purposes which the law was designed to accomplish and the consequences that would flow from alternate constructions, and then adopt the construction that results in harmony rather than inconsistency." *Id.* (citing *Colorado–Ute Elec. Ass'n, Inc. v. Pub. Utils. Comm'n of Colo.*, 760 P.2d 627, 635 (Colo. 1998)).

## IV.  Requirement of Colorado Constitution

¶ 12 The bank first contends the district court erred in concluding the loans made to the special district and the security agreements that it signed are invalid because they were not submitted to the voters in accordance with the Colorado Constitution. We agree.

¶ 13 Colo. Const. art. XI, section 6(1) requires that local government authorities receive voter approval before they may issue general obligation debt and provides:

> No political subdivision of the state shall contract any general obligation debt by loan in any form ... except by adoption of a legislative measure which shall be irrepealable until the indebtedness therein provided for shall have been fully paid or discharged, specifying the purposes to which the funds to be raised shall be applied and providing for the levy of a tax which together with such other revenue, assets, or funds as may be pledged shall be sufficient to pay the interest and principal of such debt.... [N]o such debt shall be created unless the question of incurring the same shall be submitted to and approved by a majority of the qualified taxpaying electors voting thereon, as the term "qualified taxpaying elector" shall be defined by statute.

¶ 14 Here, it is undisputed that (1) the board of the special district adopted a measure approving the debt; (2) the ballot issue specified the purposes of the debt; and (3) the voters approved the ballot issue. Nevertheless, the special district maintains that the ballot approval was insufficient. According to the special district, section 6 requires the district to identify the particular assets it intended to pledge to secure the loan along with the general obligation debt, and therefore, the pledges made by the special district of public assets to collateralize the loan were invalid. We are not persuaded.

¶ 15 We are unaware of any published opinion in Colorado that has addressed this issue. Thus, we begin by examining the plain language of the constitutional provision at issue.

¶ 16 Section 6(1) requires that voters be informed that a tax levy will be imposed to fund the debt assumed by the special district, but it does not expressly require that the ballot initiative identify the "revenue, assets, or funds as may be pledged." It states that the collateral, together with the tax levy that is provided for in the ballot initiative, shall be sufficient to pay the interest and principal of the debt.

¶ 17 The 1996 ballot informed the special district's electors that, if approved by them, the special district's debt would

> be increased up to $5,000,000 with a maximum repayment cost of up to $23,000,000 ... and [the district's] taxes [would] be increased $5,900,000 annually, or by such lesser amount as may be necessary to provide for the payment of such debt; *such debt to be evidenced by general obligation bonds or other obligations* ... such bonds or other obligations being payable from ad valorem property taxes levied against all taxable property within the district by a mill levy imposed without limitation of rate and in amount sufficient, together with other legally available revenues of the district, to pay the principal and interest on the bonds or other obligations in every year....

(Emphasis added.)

¶ 18 Relying on *Gude v. City of Lakewood*, 636 P.2d 691, 697 (Colo.1981), and *McNichols v. City & Cnty. of Denver*, 123 Colo. 132, 139–40, 230 P.2d 591, 594–95 (1950) (*McNichols II* ), the special district argues that the security agreements created a debt for the purposes of section 6, and that this debt was

not authorized by the ballot question. We are not persuaded.

¶ 19 *Gude* and *McNichols II* stand for two general principles. First, voter approval is not required for "revenue bonds" which are unlike general obligation bonds and do not constitute a debt of a municipality. *Gude,* 636 P.2d at 696–97; *see also Allardice v. Adams Cnty.,* 173 Colo. 133, 142, 476 P.2d 982, 987 (1970) ("The bonds are secured by a pledge of the revenues, a pledge of the lease and a mortgage of the project ...; and it is solely to this security which bondholders may look for payment of interest and redemption of their investment.").

■ ¶ 20 General obligation bonds are paid for with taxes. Revenue bonds are paid only by the "revenues derived from the improvement built with the funds thus borrowed." *Gude,* 636 P.2d at 696; *see also* 15 McQuillin, Municipal Corporations §§ 43:14, 43:37 (3d ed.) ("A distinguishing feature of these bonds is that their holders have no claim upon funds raised or to be raised by taxation in order to secure payment of their obligations."). This is known as the "special fund doctrine." *Gude,* 636 P.2d at 696 (citing *Perl–Mack Civic Ass'n v. Bd. of Dirs.,* 140 Colo. 371, 374, 344 P.2d 685, 687 (1959)).

¶ 21 The second principle established by *Gude* and *McNichols II* is that revenue bonds will transform into general obligation debt—and thus require voter approval—"if the revenue bonds are secured by a lien on governmental property." *Gude,* 636 P.2d at 697.

¶ 22 Here, it is undisputed that the 2004 loan was a general obligation debt because it was secured by a pledge of government property. The special district's voters approved the relevant ballot measure, which permitted the issuance of "general obligation bonds or other obligations," and the ballot measure stated that the bonds would be payable with the district's taxes. Therefore, we conclude the ballot language adequately informed the voters of the special district's intent to issue debt, and "provid[ed] for the levy of a tax" to repay that debt, thus satisfying the requirements of Colo. Const. art. XI, section 6.

¶ 23 In reaching a contrary conclusion, the district court relied on the common law rule that prohibits placing liens on public property. *See City of Westminster v. Brannan Sand & Gravel Co.,* 940 P.2d 393, 395–96 (Colo.1997). In *Brannan,* the Colorado Supreme Court examined the legislative scheme and did "not find legislative support for abrogating the common law rule prohibiting the liening of public property." *Id.* at 396. The court thus refused to permit a contractor to file a mechanics' lien against public property owned by the city. The district court also expressed its concern that voters could be "hoodwinked into approving a debt transaction of which they had only partial information," and that this could result in the foreclosure of the special district's property. *See In re Ballot Issue #45,* 234 P.3d 642, 646 (Colo.2010) ("By prohibiting multiple subjects in one proposed initiative, the constitutional rule protects against fraud and surprise occasioned by the inadvertent passage of a surreptitious provision coiled up in the folds of a complex [initiative].") (internal quotation marks omitted).

¶ 24 However, section 6 expressly permits general obligation debt where, as here, it is approved by the voters and accompanied by a tax levy. Indeed, while it is subject to the limitations in section 6, the Special District Act expressly permits special districts to "acquire, dispose of, and encumber real and personal property." § 32–1–1001(1)(f), C.R.S. 2013.

¶ 25 It is true that the security agreements potentially risked the loss of title to public property, but they also provided a potential benefit to the public because secured loans generally carry a lower interest rate than unsecured loans. Thus, the secured loans provided another way to ensure that the loans authorized by the voters would be paid in full. The security agreements were another means of implementing the bond purchase that the voters had already approved, and the voters were adequately informed that they would be required to pay for these obligations with their taxes.

¶ 26 The bank and the amicus curiae briefs filed by the Colorado Municipal Bond Dealers' Association and the Colorado Bankers'

Association have raised concerns that the district court's rulings, if upheld, would adversely affect lenders and ultimately, the citizens living in special districts. We may consider these concerns because we are required to "consider the purposes which the law was designed to accomplish and the consequences that would flow from alternate constructions, and then adopt the construction that results in harmony rather than inconsistency." *Havens*, 924 P.2d at 523.

¶ 27 The ballot initiative at issue was approved in 1996 when the special district was created, and it is likely that the special district had little to no public property at that point. During the course of the loan, it is undisputed that the parties agreed to substitute the collateral numerous times while agreeing to loan extensions.

¶ 28 The narrow interpretation of Colo. Const. art. XI, section 6 that is urged by the special district would require that special districts refrain from asking voters to approve the issuance of debt until the specific collateral can be identified that will secure a particular debt. Furthermore, a special district would be required to hold an election whenever there was a substitution of the collateral that was being pledged to secure the debt.

¶ 29 We conclude that this strained interpretation was not intended by the drafters of the Colorado Constitution, and our conclusion is buttressed by appellate decisions that have interpreted similar constitutional provisions.

¶ 30 For example, in *Bolt v. Arapahoe County School Dist. No. 6*, 898 P.2d 525, 533–34 (Colo.1995), the Colorado Supreme Court interpreted Colo. Const. art. X, section 20, or the Taxpayer's Bill of Rights (TABOR), which, like section 6, requires voter approval before additional taxes may be levied. There, the court refused to adopt a "rigid interpretation of [TABOR] which would have the effect of working a reduction in government services." 898 P.2d at 537. The court held that the school district could properly adjust a mill levy upward to "recoup tax revenue that was lost because of an [assessment] error." *Id.*

¶ 31 The special district heavily relies on *McNichols v. City & Cnty. of Denver*, 120 Colo. 380, 384, 209 P.2d 910, 912 (1949) (*McNichols I*), which preceded TABOR by many years. In *McNichols I*, the supreme court held that bond issuances "must be submitted to [the voters] in such specific language as to apprise the voters of the full purpose and the exact and particular thing upon which they are called upon to vote and decide." *Id.*; *see also* 15 McQuillin, Municipal Corporations § 40:8 ("A question submitted to the people for their vote must not be misleading, but must be specific, and in all essential particulars in compliance with the requirements of the statute or charter.") (footnotes omitted).

¶ 32 However, *McNichols I* is factually distinguishable. There, a city decided to use funds from a bond issuance for a wholly different purpose than was stated in the ballot question. Here, there is no suggestion that the special district has used the funds it obtained for a purpose that was not authorized by the voters. Thus, unlike in *McNichols I*, the ballot question in this case was not misleading.

## V. Scope of the Special District's Service Plan

¶ 33 The bank next contends the district court erred in ruling that the loan to the special district was invalid based on the special district's service plan. The district court concluded that there is a conflict between the special district's statutory authority to enter into loans, *see* § 32–1–1001(1)(e), C.R.S.2013, and the special district's service plan, which prohibited the issuance of general obligation debt. We agree with the bank.

¶ 34 The bank initially argues that the district lacks standing to collaterally attack its own service plan because of the limited enforcement mechanisms found in section 32–1–207(3)(a), C.R.S.2013. That section provides:

> Any material departure from the service plan ... may be enjoined by the court approving the organization of such special district upon its own motion, upon the motion of the board of county commissioners or governing body of a municipality

from which a resolution of approval is required by this part 2, or upon the motion of any interested party as defined in section 32 –1–204(1).

¶ 35 Section 204(1) provides that interested parties include towns and municipalities that have boundaries "within . . . three miles" and the "residents and property owners within the proposed special district." The statute does not address whether a special district may challenge its own action, nor does it limit the parties who may challenge a service plan to those listed above. *See Plains Metro. Dist.,* 250 P.3d at 701 (holding that the "Special District Act—not common law contract doctrines—controls the extent to which special districts must comply with, and courts can enforce, service plans.").

¶ 36 However, we need not resolve this issue because, even if we assume the special district has standing to challenge its own actions, we conclude the service plan did not prohibit the issuance of the general obligation debt.

¶ 37 The General Assembly enacted the Special District Act with the intent that special districts would "promote the health, safety, prosperity, security, and general welfare" of their inhabitants and of the state of Colorado. § 32–1–102(1), C.R.S.2013; *S. Fork Water & Sanitation Dist. v. Town of South Fork,* 252 P.3d 465, 468–69 (Colo.2011).

¶ 38 Special districts are political subdivisions of the state that possess various proprietary powers. But, they possess only those powers expressly conferred on them by the constitution or statute, as well as the incidental implied powers reasonably necessary to carry out the express powers. *SDI, Inc. v. Pivotal Parker Commercial, LLC,* 2012 COA 168, ¶ 16, 292 P.3d 1165.

¶ 39 Before forming a special district, a potential municipality must submit a service plan. *See* § 32–1–202, C.R.S.2013. As relevant here, the service plan must include a financial plan that shows "how the proposed services are to be financed" and must display "[a]ll proposed indebtedness . . . together with a schedule indicating the year or years in which the debt is scheduled to be issued." § 32–1–202(2)(b). The county commissioners must then approve the special district's service plan. § 32–1–203, C.R.S.2013.

¶ 40 The proposed district must then file a petition for organization with the district court. § 32–1–301, C.R.S.2013. This petition must contain a list of any potential ballot questions that will be considered at the organizational election. § 32–1–301(2)(h). At this organizational election, the "court shall also order the submission of the proposition of issuing general obligation bonds or creating other general obligation indebtedness." § 32–1–803.5, C.R.S.2013.

¶ 41 Once established, a special district must conform to a service plan "so far as practicable." § 32–1–207(1), C.R.S.2013. Any material modifications to the service plan must be approved by the board of county commissioners.

¶ 42 The Special District Act defines "material modifications" as

> changes of a basic or essential nature, including but not limited to the following: Any addition to the types of services provided by the special district; a decrease in the level of services; a decrease in the financial ability of the district to discharge the existing or proposed indebtedness; or a decrease in the existing or projected need for organized service in the area.

§ 32–1–207(2)(a). The statute further provides that "[a]pproval for modification shall not be required for changes necessary only for the execution of the original service plan." *Id.*

¶ 43 The Special District Act also sets forth the powers possessed by the boards of special districts. *See* § 32–1–1001(1), C.R.S. 2013.

¶ 44 These include the power:

(d)(I) To enter into contracts and agreements affecting the affairs of the special district . . .;

(e) To borrow money and incur indebtedness and evidence the same by certificates, notes, or debentures, and to issue bonds, including revenue bonds, in accordance with the provisions of part 11 of this article . . .; [and]

(f) To acquire, dispose of, and encumber real and personal property including, without limitation, rights and interests in property, leases, and easements necessary to the functions or the operation of the special district. . . .

*Id.*

¶ 45 At issue here is whether the district's issuance of the loan constituted a material modification of the service plan, and thus required approval by the county commissioners. The special district maintains that its service plan specifically referenced revenue bonds, and that the issuance of general obligation debt constituted a material modification of the plan. We disagree.

¶ 46 The special district's service plan does not allow or disallow the issuance of general obligation debt. In 1996, the special district's initial service plan discussed the issuance of potential revenue bonds, but did not contain assessed valuation projections for taxation because the special district "[was] not anticipating issuing general obligation bonds."

¶ 47 However, the initial service plan recognized that ad valorem taxation—which is used to pay off general obligation debt—might become necessary because the plan stated: "If necessary . . . the proposed [d]istrict reserves the right to supplement these revenues with additional revenue sources as permitted by law."

¶ 48 The 2000 amended service plan contained similar language. Like the initial service plan, it stated that the special district did not anticipate imposing a mill levy or issuing general obligation bonds, but it provided for the issuance of revenue bonds to finance the district's proposed improvements. Contrary to the position taken by the special district and the district court, the service plans did not disallow general obligation debt. We therefore conclude that the loans to the special district did not violate the plan, and that the special district had the statutory authority and voter approval to enter into the loans.

¶ 49 The district court's reliance on *Senior Corp. v. Bd. of Assessment Appeals*, 702 P.2d 732, 745 (Colo.1985), and *Millis v. Bd. of*

*Cnty. Comm'rs*, 626 P.2d 652, 655 (Colo. 1981), was misplaced because neither case addressed the issue of what constitutes a "material modification" of a service plan.

¶ 50 In *Senior Corp.*, the supreme court did not address the material modification issue because it held that the revised Special District Act did not apply to the district in that case. 702 P.2d at 745. In *Millis*, the supreme court did not find a material modification, but "assume[d] for the purposes of this opinion" that the change in interest rates from 7% to 9% "constituted a material modification and necessitated submission of the modified service plan incorporating that change to the Board for approval." 626 P.2d at 659. Also, in *Millis*, the court only addressed the validity of the board's *approval* of the modified service plan, not whether that change required modification. *Id.*

¶ 51 In *Upper Bear Creek Sanitation Dist. v. Bd. of Cnty. Commis.*, 715 P.2d 799, 802–03 (Colo.1986), the supreme court concluded there was a material modification where a special district proposed to "add water service authority to . . . existing sanitation authority [and] could have dramatically expanded its service authority." Here, however, the loan issued by the bank did not "dramatically expand" or change the special district's service authority.

¶ 52 In short, only material modifications to the service plan had to be approved by the board of county commissioners, and we conclude the loan by the bank did not constitute a material modification of the special district's service plan. Accordingly, the district court erred in invalidating the loan on that basis.

VI. Conclusion

¶ 53 In summary, we conclude (1) the 1996 election approved general obligation bonds and "other obligations" and the special district complied with the voter-approval mandate of Colo. Const. art. XI, section 6; (2) the Special District Act grants special districts the authority to "borrow money and incur indebtedness [and] acquire, dispose of, and encumber real and personal property," §§ 32–1–1001(1)(e)–(f); (3) the special district's service plan does not prohibit the issu-

ance of general obligation debt; (4) the Special District Act only requires that a special district conform to a service plan "so far as practicable," § 32–1–207(1); (5) only material modifications to the service plan had to be approved by the board of county commissioners; (6) there was no material modification of the district's service plan, and it was therefore unnecessary for the service plan to restate that the special district would be incurring general obligation debt. *See generally Wick v. Pueblo W. Metro. Dist.*, 789 P.2d 457, 458 (Colo.App.1989).

## VII.   Equitable Relief

¶ 54 The bank also contends the district court erred in denying it equitable relief pursuant to *Normandy Estates Metro. Recreation Dist. v. Normandy Estates, Ltd.*, 191 Colo. 292, 296, 553 P.2d 386, 389 (1976) (adopting the prevailing rule that, where property is furnished to a municipal corporation under an unenforceable contract, and the municipality has not paid for the property, then the seller or person supplying the property may be entitled to equitable relief. *See La Plata Med. Ctr. Assocs. v. United Bank of Durango*, 857 P.2d 410, 419 (Colo.1993)).

¶ 55 However, given our conclusions, we need not address that contention.

## VIII.   Attorney Fees

¶ 56 Pursuant to a fee-shifting provision contained in the 2004 promissory note accompanying the loan, the bank is entitled to the reasonable and necessary attorney fees it incurred at trial and on appeal. The district court is in a better position to determine the amount of such fees, and we remand the case to the district court for further proceedings on that issue. *See* C.A.R. 39.5; *Castle Rock Bank v. Team Transit, LLC*, 2012 COA 125, ¶¶ 72–75, 292 P.3d 1077.

¶ 57 The judgment is reversed, and the case is remanded to the district court for further proceedings consistent with this opinion.

JUDGE DAILEY and JUDGE GABRIEL concur.